## RURAL ELECTRIC CO. v. STATE BOARD OF EQUALIZATION ET AL.

(No. 2210; January 5, 1942; 120 Pac. (2d) 741)

452

454

For the appellants, there was a brief by *Ewing T. Kerr,* Attorney General; *H. I. Bacheller,* Deputy Attorney General; and *Arthur Kline,* Assistant Attorney General, and oral argument by *Mr. Kline.*

For the respondents, there was a brief by *Walter Q. Phelan* of Cheyenne and *J. M. Roushar* of Torrington, and oral argument by *Mr. Phelan.*

As Amici Curiae, there was a brief by *E. J. Goppert* of Cody and *George F. Guy* of Cheyenne, and oral argument by *Mr. Guy*.

BLUME, Justice.

The legislature in 1937, by Chapter 102 of the Session Laws of that year, passed a general sales-tax law. It provided by subdivision (b) of Section 4 of this act that there should be paid an excise tax of two per cent paid "to public utilities, gas, electric, heat corporations as defined in chapter 94, Wyoming Revised Statutes 1931, whether such corporations are municipally or privately owned, for gas, electricity or heat furnished for domestic, industrial or commercial consumption." The State Board of Equalization claimed that the plaintiff is subject to the tax just mentioned. The plaintiff denied that, claiming that it is not a public utility, but a private corporation. Thereupon the plaintiff brought this action, on behalf of itself and other rural electric companies, similarly situated, for a declaratory judgment to the effect that it and they are not subject to this tax. The action was brought against the foregoing Board and the individual members thereof. An answer was filed to the petition, in which it is claimed that the plaintiff and others similarly situated are public utilities, and asking the court to declare it and them to be subject to the tax above mentioned. The trial court held with the plaintiff, and from the judgment thus entered, the Board has appealed.

Plaintiff was organized in 1937 as an electrical corporation to furnish electricity to its members only. It was not organized for gain, and it has no capital stock. Membership is evidenced by a certificate of membership, issued to those who are elected members of the corporation by the board of directors. The membership fee is five dollars. Each member must agree to purchase electricity from the corporation, which must be paid for monthly according to the rate established from time to time by the board of directors, but whatever surplus may be accumulated is distributed among the members, so that the electricity will be furnished

substantially at cost. The corporation borrowed money from the Rural Electrification Administration of the Federal Government pursuant to an act of Congress, in order to build its plant and equipment. It operates in the southeastern portion of Laramie County, in which it has a membership of about 180. It also operates in the adjoining territory in the states of Nebraska and Colorado. It has solicited most of the farmers in the territory in which it operates to become members, but has denied membership to three applicants in Laramie County. It has also taken over five members who were formerly supplied with electricity from the electrical plant operated in Pine Bluffs, a town in Laramie County. Its income at the time of the trial was approximately $2300 a month, which is continuing to increase. A few other facts will be mentioned in the course of the opinion.

The parties entered into a stipulation in regard to other corporations "similarly situated." From this it appears that the Wyrulec Association, a corporation like plaintiff, has from September, 1939, supplied the public schools of the town of Huntley and of Veteran with electrictiy, whereas prior to that time they were supplied with electricity by a public utility. The Big Horn Rural Electric Company took over the plant and facilities of the Meeteetse Light Company, and since about November, 1939, has been supplying electricity to the residents of the town of Meeteetse, who were formerly supplied by the Meeteetse Light Company, a public utility. About December, 1939, the Bridger Valley Electric Association, an association similar to the plaintiff, took over the plant and facilities of the Union Light and Power Company, a public utility, at the town of Lyman, in this state. The Lower Valley Power and Light Company, seemingly a corporation similar to plaintiff, has encroached upon the customers

formerly supplied by the Star Valley Power and Light Company, a public utility.

As already stated, the plaintiff contends that it is not a public utility as defined by chapter 94 of the Revised Statutes of 1931. Before turning to that law and examining it, we should, perhaps, mention that counsel for the respondents contend that we should apply the rule that a statute imposing taxes should be strictly construed. However, the state has adopted a general policy to tax the distribution of electricity. Most of the inhabitants of the state pay this tax. The quality of electricity consumed by the members of the respondent is not different from the quality of electricity on which the tax is paid. And no specific statute can be found which shows distinctly that the legislature intended to favor one class over another in this connection, so that it would seem that the claim here made is in the nature of an exemption, and that instead of applying the rule mentioned by counsel for the respondent, it would be more appropriate to apply the rule mentioned in 59 C. J. 1335, to the effect that "in pursuance of the beneficent public policy which favors equality in the distribution of the burden of government, all exemptions of persons or property from taxation are to be construed strictly against the exemption; the intention to create exemptions must affirmatively appear and cannot be raised by implication." We shall not, however, in the decision of this case, lay any stress on that rule, but hope to find a satisfactory solution herein on broader grounds.

Section 94-101, Rev. St. 1931, defines what shall constitute a public utility. Under its terms a corporation is included within the meaning of the term "person." The section, in so far as applicable here, and in conjunction with subdivision (c) of the section, provides:

"The term 'public utility,' when used in this chapter, shall mean and include every person, or municipality,

that owns, operates, leases, controls, or has power to operate, lease or control:

* * * * *

(c) Any plant, property or facility for the generation, transmission, distribution, sale or furnishing to or for the public of electricity for light, heat or power, including any conduits, ducts or other devices, materials, apparatus or property for containing, holding or carrying conductors used or to be used for the transmission of electricity for light, heat or power;" etc.

This provision, with all superfluous and strengthening terms left out, reads that any corporation which operates "any plant, property or facility for the * * * furnishing to or for the public of electricity" shall be considered a public utility. While the provision is not free from doubt, it bears the interpretation put upon it by counsel for plaintiff, namely, that it means that a corporation is a utility only when it furnishes electricity to the public. Difficulty is encountered when we consider the reference to the power to operate, etc. That provision, with superfluous terms left out, states that a corporation which "has power to operate, lease or control * * * any plant, property or facility * * * for the * * * furnishing to or for the public of electricity" shall be considered a public utility. That is a sweeping and extremely broad provision, and seems to include any corporation which has merely the power to furnish electricity to the public, whether it actually does so or not, and clearly includes within its terms a corporation such as plaintiff. That meaning seems to be enforced by the latter part of subdivision (c) which apparently provides that under the head of public utility shall be included any apparatus or property "used or to be used for the transmission of electricity, heat or power." It may be conceded that the legislature lacks the power to make a provision as broad as the language here set out indicates, at least as to some persons and corporations (State ex rel. v. Public Ser.

Com., 275 Mo. 483, 205 S. W. 36, 18 A. L. R. 754; Allen v. Railroad Comm., 179 Cal. 68, 175 Pac. 466, 8 A. L. R. 249), and we have pointed out these provisions merely to show that the section gives no support to the contention of plaintiff herein, but would seem to indicate that this court should not give a narrow, but a liberal construction to the term "public utility."

Section 94-101, supra, makes certain exceptions and provides as follows:

"None of the provisions of this chapter shall apply to interstate commerce, nor to farmers' mutual telephone associations having no capital stock and furnishing service to members of such associations only and without tolls, except as provided in § 94-145 hereof; nor to the generation, transmission or distribution of electricity, nor to the manufacture or distribution of gas, nor to the furnishing or distribution of water, nor to the production, delivery or furnishing of steam or any other substance, by a producer or other person, for the sole use of such producer or other person or for the use of tenants of such producer or other person and not for sale to others."

The first exception relates to mutual telephone companies charging no tolls. The reference to section 94-145 makes the provision somewhat obscure. But we need not determine the exact meaning, and merely note that an exception was made. Counsel for the plaintiff argued that since mutual telephone companies were excluded from the legislative act, it is reasonable to conclude that it also intended to exclude mutual electrical companies. But the exact contrary might well be argued, namely, that since the legislature only excluded mutual telephone companies, it did not intend to exclude any other mutual companies, and that seems to be true in view of section 94-145 which we shall mention hereafter. Moreover, the legislature had in mind the furnishing of electricity in certain cases. It specifically provided that if a person produced electricity for his own use or that of his tenants, he should not

come within the provisions of the act. Reference is also made to "other persons." That evidently means that if a person buys electricity from a producer for his own use and that of his tenants—for instance, an owner of an apartment house, "dude ranch" or factory —such person (or corporation) should not come within the purview of the legislative act. In view of these specific exceptions we are at once confronted with the fact that "we cannot overlook the well-settled principles that when the legislature has made exceptions to a general rule, it must be deemed to have included in its exceptions all that it intended to except." Rothschild v. Superior Court, 109 Cal. App. 345, 293 Pac. 106, 108. Many cases in support of this rule are cited in 59 C. J. 1092, including In Re Caldwell's Estate, 26 Wyo. 412, 186 Pac. 499. By applying that rule in the case at bar, there is no escape from the conclusion that the legislature intended the plaintiff in this case to be included within the meaning of a "public utility." If any doubt were left on the subject, it would, we think, be dissipated by the provision of section 94-145, Rev. St. 1931, which provides in part:

"No street railroad, gas, electrical, telephone or water public utility operating for profit or *mutual benefit* shall henceforth begin the construction of a street railroad, or of a line, plant, or system * * * without having first obtained from the commission a certificate that the present or future public convenience and necessity require or will require such construction," etc.

This section clearly recognizes that a corporation which operates an electric plant for mutual benefit of its members, and not for profit, may be a public utility.

The constitutionality of the statute has not been assailed, so we shall not, directly in any event, consider that point. But, in view of the importance which rural electric companies now play, and are likely to play in the future, in the economic life of the state and nation,

we might seem to be remiss in our consideration of the case if we rested our decision upon what has already been stated, without considering the case from a broad and fundamental standpoint, and without investigating whether, on the whole, the legislature may be said to have acted reasonably in declaring associations like plaintiff to be public utilities, as seemingly it has done, or whether, on the other hand, the construction of the statute which it seemingly bears is so unreasonable that it should be rejected.

We are cited to Inland Empire Rural Electrification Ind. v. Public Service Commission, 199 Wash. 527, 92 P. (2d) 258, and Garkane Power Co. v. Public Service Comm., 98 Utah 466, 100 P. (2d) 571, in which a rural mutual electric company was held not to be subject to the control of the public service commission of the state. But these cases are not controlling herein, for the reason that the statutes in these states are different from our own. The Washington statutes contain neither the exception mentioned in section 94-101, supra, nor the provision quoted from section 94-145, supra. Furthermore, the court in the Washington case relied to some extent at least on the fact that the statutes in that state contained detailed provisions as to the organization and powers and duties of mutual companies, without making any reference to public utilities. Our statutes, while providing for companies without capital stock, contain no such provisions as the Washington statutes. The Utah statutes contain no such provision as that cited from Section 94-145, supra, and provides that "the term public utility includes every common carrier, gas corporation, electric corporation, water corporation, heat corporation and warehousemen where the service is performed for or the commodity delivered to, the public generally." (Section 76 2-1 sub. 28.) Nor did the court discuss any

exceptions such as contained in our section 94-101, supra.

Counsel for the plaintiff also cite us to State Board of Equalization v. Stanolind Oil & Gas Co., 54 Wyo. 521, 94 P. (2d) 147, as decisive herein. In that case the company delivered to another company, an oil refining company, electricity for light and power; it made wholesale sales of electricity to two other companies, and "the rest of the electricity was used solely by it in the performance of its contracts with lease owners, and in the operation of its own plant and facilities; it never owned or operated any plant for selling or furnishing electricity to the public." We indicated (aside from the stipulation in that case) that the company was not a public utility. The decision in that case is supported by many other cases which show facts similar to those in that case. Schumaker v. Railroad Commission, 185 Wisc. 303, 201 N. W. 241; Overlook Development Company v. Public Service Comm., 306 Pa. St. 43; Cawker et al. v. Meyer, 147 Wisc. 320, 133 N. W. 157, 37 L. R. A. N. S. 510; Ford Hydro-Electric Co. v. Aurora, 206 Wisc. 489, 240 N. W. 418; Colorado Utilities Corp. v. Public Utilities Commission, 99 Colo. 189, 61 P. (2d) 849; Nowata County Gas Co. v. Henry Oil Company, 269 Fed. 742; State ex rel. v. Public Service Comm., 275 Mo. 483, 205 S. W. 36; State ex rel. R. Co. v. Spokane etc. R. Co., 89 Wash. 599, 154 Pac. 1110; Junction Water Co. v. Riddle, 108 N. J. Eq. 523, 155 Atl. 887; Borough of Ambridge v. Pub. Serv. Comm., 108 Pa. Super. Ct. 298, 165 Atl. 47; Southern Ohio Power Co. v. Public Serv. Comm., 110 Oh. St. 246; City of St. Louis v. Fuel Corporation, 97 F. (2d) 726; Stoehr v. Natatorium Co., 34 Idaho 217, 200 Pac. 132. These cases, while worthy of perusal in order to gain a comprehensive view of the subject before us, are not controlling, and we shall not take the time or space to analyze them. More closely in point are cases

which deal with mutual or co-operative companies or associations.

In People ex rel. v. Orange County Farmers' and Merchants' Association, 56 Cal. App. 205, 204 Pac. 873, the association was organized to establish a farmers', fruit growers', merchants' and business men's improvement, information and publicity bureau and system for the benefit and mutual improvement of the members of the association, and to facilitate the exchange of information, advices and ideas, as to crops, weather, financial and other matters among its members. No fees were to be paid except amounts sufficient to pay the expense of operation. The association constructed a telephone line, and received authority from the board of commissioners of the county to erect poles and wires along the roads of the county. The statute defined a telephone corporation as one which operated a telephone system for compensation. It was held that the association was not a public utility, and could not be required to apply for a certificate of necessity. The court approved the holding of the public utility commission which had held that the association was not under its control. The court likened the association to a department store which constructs a telephone system to connect with its various departments.

In State v. Southern Elkhorn Telephone Company, 106 Nebr. 342, 183 N. W. 562, it appears that ten farmers constructed a rural telephone line, adopting the name of Southern Elkhorn Tel. Company, though not incorporated. Each of the farmers contributed his proper proportion of the expense of constructing the lines, keeping the lines in repair and paying the expense thereof by assessments against the individual members. The Nebraska Telephone Company at Norfolk furnished switching service for them and arranged to connect them with the Norfolk subscribers and with long distance lines. The agreement among

them in connection with constructing the lines did not provide for taking in any new members. One Doxstader wanted to connect with the lines but was refused permission to do so. The State brought an action to compel this permission. The court held that the association was not a public utility and was not compelled to give the permission to connect with its lines. The statute defined telephone and telegraph companies as those engaged in the transmission of messages for hire. A like conclusion under a similar statute was reached in State v. Public Service Commission, 272 Mo. 627, L. R. A. 1918 C 820, in connection with a mutual telephone association consisting of a large number of members, who individually owned the lines and boxes on their own property, the association as such owning but a small amount of the lines connecting the various individuals.

In State Utilities Com. ex rel. v. The Bethany Mutual Telephone Association, 270 Ill. 183, 110 N. E. 334, it was held that a telephone association organized purely for the purpose of serving its members, is not subject to the control of the State Utilities Commission. The holding in that case was followed in The State Utilities Commission v. The Okaw Valley Mutual Telephone Association, 282 Ill. 336, in which it appears that the association consisted of about forty persons. At least most of these cases are distinguishable. Some of them, especially those from Illinois, are rather sweeping in their scope, and may be said to be borderline cases. We hardly think that that court meant to announce doctrines contrary to those announced in the cases hereafter mentioned. At least we do not think them controlling herein.

Counsel for plaintiff have misunderstood Alabama Power Co. v. Cullman County Electric M. Corp., 234 Ala. 396, 174 So. 866, and Carolina Power & Light Co. v. Electric Membership Corporation, 211 N. C. 717,

192 S. E. 105. It was held in these cases that a rural electric company does not need a certificate of necessity from the public service commission. But that holding was based on specific provisions of a statute. The latter case does not determine whether the rural electric company is or is not a public utility, while in the former of these cases, it is expressly recognized that it is. Section 18 of Chapter 442 of the Session Laws of Virginia of 1936 provides that such rural electric company is subject to the public utility commission "in the same manner and to the same extent as are other similar utilities under the laws of Virginia." By section 18, Chapter 175, Laws of 1935, the Indiana public service commission was given the same power to fix rates of a rural electric company in the same manner as of other public utilities. In Maine, too, such corporation was by c. 230, Laws of 1931, put under the control of the public utility commission of that state. While it may, perhaps, be argued that in view of the special provisions subjecting rural electric companies to the control of the public service commission, indicates that in the absence of such special provision, it would not be deemed to be thus subject, the legislation also indicates that the legislatures of these states deemed it proper that such companies should be considered public utilities. C. 115, Laws of North Dakota of 1937; c. 100, Laws of New Mexico of 1937; c. 172, Laws of Montana of 1939; No. 389 (page 1969) of the laws of Pennsylvania of 1937; c. 46, Laws of Oklahoma of 1939, directly or indirectly provide that rural electric companies shall not be subject to the control of the public service commission of the state. While these legislatures thought that such companies *ought not* to be thus subjected, they evidently also thought that in the absence of such special provision they would have, or at least might have, come under such control—in other words, would or might have been held to be

public utilities. Thus we find numerous legislatures occupied with the thought that such companies were, or at least might not inappropriately be considered, as public utilities.

The public service commissions (using that term herein indiscriminately for a commission which in the respective states has power over public utilities) which have passed on the question before us, have not been unanimous in their holdings. The commission in Oklahoma held a rural electric company, such as the plaintiff herein, not to be a public utility under the Oklahoma statutes which, as may be seen from the opinion, are different from ours. 27 Public Utilities Reports (N. S.) 321. The public service commission of New Jersey during this year has held the contrary under a statute which defines a public utility as one which renders service to the public. The public service commission of West Virginia, too, held likewise in 1938. 24 Public Utilities Report (N. S.) 7. It called attention to the fact that rural electric companies receive public loans, indicating that the benefit thereof should not be confined to a limited number. The Supreme Court of Utah in Garkane Power Co. v. Public Service Commission, supra, answered this argument by saying that if such contention were true "we must also class as public utilities, bound to serve the public, all the many hundreds of thousands of business organizations which have borrowed from the Federal Government through the R. F. C., P. C. C., etc." The thrust would have been well directed, except for the fact, overlooked by the court, and not mentioned by the public service commission of West Virginia, that the act providing for loans to rural electric companies (7 U. S. C. A. Sec. 904) provides that "no loan for the construction, operation, or enlargement of any generating plant shall be made unless the consent of the State Authority having jurisdiction in the premises is first obtained." Loans

to private corporations are not, at least generally, supervised by any State Authority, so that Congress probably had in mind that such companies would or should be considered public and not private corporations.

We find, accordingly, that service commissions, as well as legislatures, have not perceived anything extraordinary in the fact that associations like plaintiff should be deemed to have devoted their property to public use, and while that is not, of course, controlling on courts, such wide-spread public opinion would at least cause us to hesitate to announce a contrary rule under statutes such as we have, and in holding the provisions thereof to be so unreasonable as to require us to ignore them. And considering the subject as a whole, and examining the authorities bearing thereon, we find ample support for the position taken by our legislature.

In order that an owner of an electric plant may be said to be a public utility, his or its property must be devoted to public use. Stoehr v. Natatorium Co., 34 Idaho 217, 200 Pac. 132; Story v. Richardson, 186 Cal. 162, 198 Pac. 1057, 18 A. L. R. 750; 51 C. J. 5. And it has been held that such dedication will not be presumed without evidence of unequivocal intention. Stoehr v. Natatorium Co., supra; Southern Ohio Power Co. v. Pub. Util. Comm., 110 Ohio St. 246, 143 N. E. 700; Allen v. R. R. Co., 179 Cal. 68, 175 Pac. 466; 8 A. L. R. 249. Still that intention may be shown by the circumstances in a case. The facts govern. It does not, as will appear later, solely depend upon the wishes and the declaration of the owner. This much, doubtless, is true, that an owner of such a plant must at least have undertaken to actually engage in business and supply at least some of his commodity to some of the public. That has been done in this case. Supplying electricity has long been, and now is universally recognized as a

service in which the public may be interested, and which, accordingly, may be impressed with a public character, in the absence of countervailing reasons. Wyman on Public Service Corporations, Sec. 243. It has been held that the "mere purchase, transmission and sale of electric energy, a commercial product, without more, contains no indication of public service." State ex rel. v. Baker, 320 Mo. 1146; Southern Ohio Power Co. v. Pub. Util. Com., supra. That may be conceded, still it would seem that the character of service may be taken into consideration when additional facts exist. The sale and furnishing of lumber, for instance, stands on a different footing from the sale and furnishing of electricity under certain conditions. We may infer a public service in the one case when we would not in the other. See 51 C. J. 5. It has been held that the number of customers is not a criterion. Dairymen's Co-op. Sales Ass'n. v. Pub. Ser. Com., 318 Pa. 381, 177 Atl. 770, 98 A. L. R. 218. Still we are led to suspect that limited service has had much to do with decisions in certain cases. It seems to be one of the natural criteria in determining the question whether or not we are dealing with a public utility, if we are dealing with the service of a commodity in which the public has generally been held to have an interest. And that was directly stated in Pennsylvania Chataqua v. Pub. Ser. Comm., 105 Pa. Super. Ct. 160, where the court stated that "in our view, the character and extent of the water service rendered made it public." Similar in effect are Industrial Gas Co. v. Pub. Ut. Comm., 135 Oh. St. 408, 21 N. E. (2d) 166; Clarksburg Light & Heat Co. v. Pub. Serv. Comm., 84 W. Va. 638, 100 S. E. 551; Davis v. People ex rel., 79 Colo. 642, 247 Pac. 801. These cases will presently be specially considered. See also 89 U. of Pa. L. R. 1108. It has been said that "a true criterion by which to judge of the character of the use of any plant or system alleged to

be a public utility, is whether or not the public may enjoy it of right or by permission only." Junction Water Co. v. Riddle, 108 N. J. Eq. 523, 526, 155 Atl. 887; Farmers' Market Co. v. R. R. Co., 142 Pa. 580, 21 Atl. 989. While that feature frequently comes into prominence, it is, perhaps, not quite correct to call it a "criterion." It is, rather, ordinarily, an incidence, a necessary result, an essential feature, of the dedication to public use. To state that property has been devoted to public use, is to state also that the public generally, in so far as it is feasible, has the right to enjoy service therefrom. It may be as difficult to determine the one fact as the other. In such case we cannot determine the right to demand such service by the fact that the plant is a public utility, and the fact that it is a public utility by the fact that the right to demand the service exists. That would be simply reasoning in a circle. The fact of dedication to the public, as well as the right to demand service on the part of the public generally, may be shown by explicit profession, or indirectly by indiscriminate service or solicitation, by the exercise of the right of eminent domain, by the voluntary submission to regulation and by perhaps other facts, although some of these facts may not be controlling. See 51 C. J. pp. 5-6. When the existence of a public utility is denied or contested, that phase of the question which relates to the right of the general public to demand service is ordinarily, or at least frequently, in the forefront, by reason of the fact that we generally meet with contracts entered into by the owner with consumers, or with provisions made for limited membership, as in the case at bar. So the question in such cases naturally is as to whether or not notwithstanding that, any one else has an equal right to the services of the owner. The facts in the case may be such, as in the cases already cited, that a court hesitates to hold that the owner should be held to be a public utility. And

counsel for plaintiff have emphasized the contractual limitation. They rely upon 51 C. J. 5, which states that the test as to whether an owner is a public utility or not is "whether or not such person holds himself out, expressly or impliedly, as engaged in the business of supplying his product or service to the public as a class or to any limited portion of it, as contradistinguished from holding himself out as ready to serve only particular individuals." See also 13 C. J. S. 26-28; 9 Am. Jur. 431. Of course, if the service is rendered pursuant to contract or limited membership, it is difficult to hold that one has expressly held himself out as ready to serve the public generally. But the text does not require an express holding out. It may be done impliedly, as by wide solicitation and other factors. Keystone Warehousing Company v. Pub. Serv. Comm., 105 Pa. Super. 267; Bingaman v. Pub. Serv. Comm., 105 Pa. Super. 272; Erb v. Pub. Serv. Comm., 93 Pa. St. 421. This counsel have overlooked. If by entering into contracts, or limiting service to members, the owner may in all cases escape the burdens attending a public utility, the plaintiff herein cannot be said to be such utility. If that is true, then, of course, plaintiff, though it should absorb all other like organizations in the state, and obtain a large membership in all rural sections therein, could not even then be called a public utility, and we are unable to see how it would make any difference if it should make most of the consumers of electricity in our towns and cities its members. The authorities do not, we think, call for any such result.

In United States v. Ohio Oil Co., et al., 234 U. S. 548, 58 L. Ed. 1459, 34 Sup. Ct. 956, the owner of a pipe line carried everybody's oil, who offered it, but only when offered for sale to the owner of the pipe line. In other words, the oil owned by the public was carried by the owner of the pipe line under what may be desig-

nated a contract. It was held to be a common carrier, the court holding that Congress has power to "require those who are common carriers in substance to become so in form." In Davis v. People, ex rel., 79 Colo. 642, 247 Pac. 801, it appears that Davis hauled freight by truck for over 90% of shippers in his territory. He had organized most of the shippers into an association, which, however, was in fact a sham organization. Davis hauled goods under a contract with this organization. He was held to be a common carrier, the court stating in part:

"In determining whether a business is that of a common carrier, 'the important thing is what it does, not what its charter says.' Terminal Taxicab Co. v. Kutz, et al., 241 U. S. 252, 36 S. Ct. 583, 60 L. Ed. 984, Ann. Cas. 1916 D. 765. A service may effect 'so considerable a fraction of the public that it is public in the same sense in which any other may be called so. * * * The public does not mean everybody all the time.' id. Had defendant made all save one of the shippers of freight in that territory, or all purchasers of postage at any post office therein, members of the association, and claimed that such limitation converted an otherwise public into a private carrier, the contention would be so absurd as to be instantly rejected. But the reasons for that rejection would be the identical reasons which demand rejection of defendant's contention, in the instant case: (a) The proportion of the public served is so large as to be the public; (b) the limitation is a mere device to hoodwink the law."

In Terminal Taxicab Co. v. Kutz, et al., 241 U. S. 252, 36 Sup. Ct. 583, a taxicab company, forbidden by its charter to engage in public service, hauled, under contract with a railway station company and some hotels, persons going from and to the station and guests from and to the hotels, the contract giving the taxicab company the exclusive right to solicit the public at these places for the purpose of transportation. The company was held to be a common carrier.

In Dairymen's Co-Op. Sales Ass'n. v. Public Service Comm., 318 Pa. 381, 177 Atl. 770, 98 A. L. R. 218, already cited, the court, while holding that the carrier involved in that case was not a common carrier, stated that "the status of one as a common carrier is not changed by an occasional refusal to perform services for which he is equipped or by the fact that he does not advertize, and the fact that one makes written contracts with his patrons is not controlling in determining that question. Erb v. P. S. Com., 93 Pa. Super. 421; Bingaman v. P. S. Comm., 105 Pa. Super. 272, 161 Atl. 892. What constitutes a common carrier is a question of law, but whether one charged with being a common carrier has by his method of operation brought himself within that definition is a question of fact to be determined from the evidence in such cases as it arises. * * * Mere schemes or devices to avoid the duties and responsibilities of a common carrier are impotent for the purpose intended when the true character of such acts is established." In Erb v. Public Serv. Comm., supra, Bingaman v. P. S. Comm., supra, and Keystone Warehousing Co. v. P. S. Comm., 105 Pa. Super. 267, the court took into consideration the fact that the services performed by the carrier was not incidental to any other business, but constituted his sole business. Entering into private contracts was held not to be controlling. And the court in Goldsworthy v. Pub. Ser. Comm., 141 Md. 674, 119 Atl. 693, pointed out that if entering into contracts with customers would control the determination whether an owner is a public utility or not, that would be an easy way of evading the law. In Cushing v. White, 101 Wash. 172, 172 Pac. 229, L. R. A. 1918 F. 463, the court stated that whether an owner is a public utility or not "must be determined by the character of the business carried on * * * and not by any secret intention or mental reservation it may entertain or assert when charged with the duties

and obligations which the law imposes." See also 9 Am. Jur. 437; note 18 A. L. R. 1320-1321. While some of the authorities here cited deal with common carriers, the rules there announced are equally applicable in a case like that at bar. In Pennsylvania Chataqua, plaintiff, v. Public Service Commission, 105 Pa. Super. 160, 160 Atl. 225, the plaintiff, incorporated as a mutual company for only educational purposes, acquired about 30 acres of land, which was divided into lots and sold to stockholders, and water was furnished them under contract which contained certain covenants. But some of the water was also furnished to non-stockholders, and there were in all about 152 consumers. It was held that the plaintiff was a public utility, the court stating, as already shown, that "in our view, the character and extent of the water service rendered make it public." In Valcour v. Morrisville, 110 Vt. 93, 2 A. (2d) 312, it was held that as long as a village furnishing electricity to a rural community "serves and monopolizes this territory, it should not be permitted to discriminate between those desiring such service." In Consolidation Coal Company v. Martin, 113 F. (2d) 813, the court stated that *"acceptance of substantially all requests for service* (of electricity) constituted an election to engage in such business. The company has in practical effect devoted its property in part to a public function." (Italics are ours.) In Wingrove v. Public Service Comm., 74 W. Va. 190, 81 S. E. 734, L. R. A. 1918 A. 210, a company owning an electric light plant, which was primarily erected for its own use, undertook, nevertheless, though not authorized by its charter, to furnish light to the people of the community, freely doing so, upon application, except in three instances. It was held that "acceptance of practically all applications for service, made by the citizens of the town, is a sufficient election to engage in the business and manifestation thereof, without advertise-

ment of the fact or solicitation of customers." The same court in Clarksburg Light & Heat Co. v. Pub. Ser. Comm., 84 W. Va. 6338, 100 S. E. 551, stated in part as follows:

"The fact that the conduct of any particular enterprise may have in the remote or even recent past been considered as entirely the subject of private contract, while persuasive of the private charter of the business, is not at all conclusive. Of course it is very well recognized that in order to make any particular business subject to the police power it must be affected with a public interest. Not only must the service offered be available to anyone who applies for it, but anyone who desires it must have the right to demand it upon complying with proper regulations, and the payment of proper charges therefor. It must be such a business as the public authorities have a right to subject to the regulatory power of the state for the benefit of its inhabitants, and the question in this case is, is the petitioner's business such a one? When does any particular enterprise or line of business fall within the regulatory power of public authority? From what we have said it is apparent that no rule can be laid down which can be followed blindly or arbitrarily over any period of time. The ever-changing conditions of modern business, and the constantly varying relations of the public to such business, make necessary the extension of this power in the interest of the public to such businesses as may by their conduct decidedly influence for weal or for woe the general welfare of the community. And it may be said that whenever the relation of any business or enterprise to the public, or to any substantial part of a community becomes so close as to make the welfare of the public, or any substantial part of it, depend upon the proper conduct of such business, then it becomes a subject upon which the regulatory power of the state may be exercised for the benefit of the whole, and the determination by the legislature that a particular business belongs to such class will not be set aside where there is a substantial foundation for it."

This case was cited and relied upon to a considerable extent in State ex rel. v. Industrial Gas Co., 58 Ohio

App. 101, 16 N. E. (2d) 218, which, though in many respects different from the case at bar, has some features which are similar. The Industrial Gas Company never furnished gas to the public indiscriminately, but under contracts, and the main question arising in the case was as to whether or not indiscriminate service was essential, in order to make it a public utility. The court conceded that if this was essential, it could not be so classified. The court, however, held:

"We do not conceive the test to be so narrow, * * * If public use be given the restricted meaning contended for by defendant company, it is conceivable that utilities could serve great numbers of consumers of their product directly, if confined to a class, and escape any obligation as a public utility and prevent any regulation by the state."

Industrial Gas Company v. Public Utilities Commission, 135 Oh. St. 408, 21 N. E. (2d) 166, involved every vital question involved in the case at bar. It appears therein that plaintiff company was operating about 50 miles of pipe lines, was serving 19 industrial consumers and 12 private consumers, all under written contract which stipulated the price to be paid for gas; the plaintiff company never held itself out as ready to serve the public generally, and had refused to serve certain applicants. The company made an application to be permitted to withdraw from the field of serving private consumers, and amended its certificate of incorporation to that end. It contended that it was not a public utility. The court, holding that it was, stated in part as follows:

"It is what the corporation is doing rather than the purpose clause that determines whether the business has the element of public utility. * * * The appellant with its fifty miles of pipe lines running through four counties supplying nineteen industrial plants with natural gas was rendering a service to a substantial part of the state that would ordinarily be serviced by

public utilities under regulatory restrictions. It may well be urged that a corporation, calculated to compete with public utilities and take away business from them, should be under like regulatory restriction if effective governmental supervision is to be maintained. Actual or potential competition with other corporations whose business is clothed with a public interest is a factor to be considered; otherwise corporations could be organized with bona fide utilities until the whole state would be honey-combed with them and public regulation would become a sham and delusion. What appellant seeks to do is to pick out certain industrial consumers in select territory and serve them under special contracts to the exclusion of all others except such private or domestic consumers as may suit its convenience and advantage. There were other industrial consumers with whom the appellant refused or failed to agree and so did not serve them. If such consumers were served at all, it must necessarily be by a competitor. If a business so carried on may escape public regulation then there would seem to be no valid reason why appellant may not extend the service to double, triple or many times the number now served without being amenable to regulative measures. * * * It is not a controlling factor that the corporation supplying service does not hold itself out to serve the public generally. It has been held that a business may be so far affected with a public interest that it is subject to regulation as to rates and charges even though the public does not have the right to demand and receive service. * * * Regardless of the right of the public to demand and receive service in a particular instance, the question whether a business enterprise constitutes a public utility is determined by the nature of its operations. Each case must stand upon the facts peculiar to it. A corporation that serves such a substantial part of the public as to make its rates, charges and methods of operations a matter of public concern, welfare and interest subjects itself to regulation by the duly constituted governmental authority. * * * Nor should the curtailment of its incidental corporate functions made with the purpose of avoiding regulatory processes be determinative of the true character of its business. Thus, changing the purpose clause of its charter, refraining from use of the right of eminent domain,

avoiding a holding out to serve the public generally and selling only to select consumers by private contract could be employed as subterfuges by many public utility companies. If the business is still affected with a public interest, it remains a public utility. It is the conclusion of this court that appellant dedicated itself to public utility service in behalf of a substantial part of the public and within a substantial area so as to make its business a matter of public concern, welfare and interest; consequently it is a public utility and subject to regulation by the Public Utilities Commission."

These cases, we think, clearly establish the law to be that merely because an owner enters into contracts in connection with his service, and in some instances refuses service, is not a controlling factor. If that is correct that must be true also in connection with an owner with limited membership, as in the case at bar, since such limited membership is but another form of an attempted limitation by contract. And turning to the facts in the case at bar, all the prominent factors, announced by the foregoing authorities as indicative of a public utility, are present. (1) Plaintiff deals in a commodity in which the public as a whole is generally interested. (2) It is actually engaged in business and is supplying its commodity to some of the public. (3) It serves a substantial portion of the public, within the meaning of the cases cited. It operates in the southeastern portion of Laramie county in this state and in the adjacent territory in Nebraska and Colorado. It has a membership of 180 in Laramie County. Counting 4 members to a family, it serves a population of probably approximately 700 people in that county. And if we may assume that it serves an equal population in Nebraska and Colorado, it probably serves a population of approximately 2000 people. (4) While the evidence is not as clear as could be wished, the circumstances indicate that it has a monopoly in the rural portion of the territory in which it operates, which is

a factor to be taken into consideration, as held in Valcour v. Morrisville, supra. (5) It solicited practically everyone in that territory, and has rejected but three applications in Laramie county, so that it may well be said, within the meaning of the cases heretofore cited, that it has accepted substantially all requests for service of its commodity. (6) It is in direct contact with at least the municipal electric light plant at the town of Pine Bluffs which supplies electricity to the people of that town. It has it in its power, if it can furnish electricity sufficiently cheaply, to destroy that plant. Contact with a public utility and ability to compete with it, ought not to be ignored, in determining the question before us. Industrial Gas Co. v. Public Utility Commission, supra, and see Ashley-Tri Mutual Tel. Co. v. New Ashley Tel. Co., 92 Ohio St. 336, 110 N. E. 959; see also 89 U. of Pa. L. R. 1107-1108. Counsel for plaintiff argue that we should not declare plaintiff to be a public utility, until greater competition and a more extensive invasion of another's field has been shown. But we recall the ancient adage that "an ounce of prevention is better than a pound of cure." Some competition and some invasion on the part of plaintiff has already been shown, since it now serves five customers which were formerly served by the public utility at Pine Bluffs, and two of the parties in whose behalf this action is brought, as being situated similarly as plaintiff, have already bodily taken over the plant and facilities of corporations which admittedly are or were public utilities. Other signs, indicative of a public utility, are not wanting. (7) The plaintiff has the power of eminent domain under the laws of this state. Sec. 38-401, Rev. St. 1931. And while that is not determinative of its status as a public utility, it is a factor which may be taken into consideration. State ex rel. v. Baker, 320 Mo. 1146, 1151, 9 S. W. (2d) 589. It has not, so far as the record

shows, exercised that power. (8) But its poles for electric wires are strung along county and state highways. And while that fact, too, cannot be considered as determinative of its status (State Pub. Ut. Comm. v. Bethany Mutual Tel. Co., supra), nevertheless, as pointed out by the public utility commission of New Jersey, it "involves the acquirement of special privileges in these highways and places. There is a public interest in the grant and acquirement of such public privileges," and may, therefore, be taken into consideration, in connection with other facts. Moreover, it is clear that the plaintiff, if necessary, will exercise the right of eminent domain, for it is given power in its certificate of incorporation to "do and perform * * * any and all things, and to have and exercise any and all powers as may be necessary or convenient to accomplish" any and all of its purposes. (9) Furthermore, section 7 of its by-laws provides that the board of directors shall cause to be established a complete accounting system, which, "among other things, *subject to applicable laws and rules and regulations of any regulatory body,* shall conform to the system designated by the Rural Electrification Administration." The only law to which such accounting system could be subject would be that provided on behalf of the public service commission of this state in section 94-144, Rev. St. 1931. So that it would seem that the plaintiff itself has recognized the fact that it is subject to that commission.

We think we must hold, under our statutes and under the authorities heretofore cited, that the plaintiff is a public utility, and that is true with associations similarly situated. The judgment of the trial court is accordingly reversed with directions to enter judgment in favor of the defendants as prayed in the answer.

*Reversed, with directions.*

RINER, Ch. J., and KIMBALL, J., concur.

ON PETITION FOR REHEARING

BLUME, Justice.

A petition for rehearing has been filed herein, and various statements in the original opinion herein are asserted to be erroneous, although the main reasoning of the court is not attacked. The various points contained in the brief accompanying the petition for rehearing were but links in the reasoning as a whole. It is, for instance, stated that we laid too much stress on the fact that rural electric companies in this state have taken over customers or even public utility companies, and that that was done in pursuance of requests on the part of the public utilities theretofore existing. The record shows that to be true partially. We stated in our opinion that "contact with a public utility and ability to compete with it, ought not to be ignored." In other words, we merely stated that potential competition is a factor to be taken into consideration. The authorities cited by us bear that out. Again, it is stated that since the legislature in 1941 amended the law relating to the sales tax and making it specific that rural electric companies should come within its provisions, it is shown that they did not originally come within the statute. But a controversy on that point was then pending; the trial court had held that these companies were not subject to the sales tax, and the legislature apparently, and probably at the behest of the public utility commission, made the amendment merely, so that there would be no question that from that time forth, they should not be exempt under the law, even though we should affirm the judgment of the trial court. Under these circumstances that amendment does not, we think, affect the question as to whether or not these companies are public utilities. Again, it is argued that since the legislature in 1937 by chapter 28 of the Session Laws of that year amended Section 94-145, Rev. St. 1931 by omitting the phrase "operating

for * * * mutual benefit," we wrongly took the section as it originally read into consideration. That seems to be an afterthought. The Attorney General in his brief on appeal claimed that this section as it was originally enacted has a bearing in determining the intent of the legislature, and we find nothing in the original brief of plaintiff in answer thereto. Nor can we see the force of counsel's argument made now. The section was a part of Chapter 146, Session Laws of 1915, which provided for a public utility commission, and in which the term public utility was sought to be defined by the legislature. The intent of the legislature as to the meaning of the term must be gathered in the main, if not entirely, from the act as it was originally passed, and hence all the various parts thereof, unless, of course, material amendments had been made since that time showing a different intent. So far as we know there are no such amendments. The amendment above mentioned merely changes some of the provisions in connection with a certificate of convenience, and instead of enumerating the various companies to which it shall apply, embraces them all by the term "no public utility." That in no way indicates that the meaning of a public utility has been attempted to be changed. Again, it is argued that since no rural electric companies were in existence in 1915 or until recent times, the legislature naturally did not exclude them from the term "public utilities," as was done with some mutual telephone companies. But the law specifically provided when and under what circumstances the distribution of electricity should be exempted under the law. Rural electric companies were not excluded. Counsel have not pointed out the right, power or authority of this court to add to the provisions specifically made by the legislature, yet that is clearly what counsel would have us do. It seems clear to us that, in view of the statute as it stands, if rural electric companies want to

be exempt from the law, they should go to the legislature, and that this court is the wrong tribunal in which to seek relief. We made an exhaustive investigation of the subject before us, as may be gathered from the original opinion, devoted weeks of time to obtain a correct solution, and we arrived at a conclusion only after pains-taking care. We fully realize that for the present at least, it may be questioned whether rural electric companies should, as a matter of public policy, come under the control of public utilities, but that public policy is for the legislature, and not for this court.

We can find no reason for a rehearing, and it is, accordingly, denied.

*Rehearing denied.*

RINER, Ch. J., and KIMBALL, J., concur.