# IN RE CONDEMNATION BY DAIRYLAND POWER COOPERATIVE OF EASEMENT OVER CERTAIN LANDS IN OLMSTED COUNTY.
# DAIRYLAND POWER COOPERATIVE v. WILLIAM BRENNAN AND OTHERS.

82 N. W. (2d) 56.

February 1, 1957—No. 36,978.

558

 

*Foley & Foley,* for relators.

*Maloney & Wheeler* and *James T. Spillane,* for respondent.

MURPHY, JUDGE.

This case comes to us on certiorari from an order of the District Court of Olmsted County granting petitions for condemnation in 13 actions relating to separate tracts of land, which actions were consolidated for trial. The petitioner seeks to exercise the right of eminent domain to provide right-of-way to construct electric transmission lines. The relators, who are the objecting property owners, contend that the proposed taking is not necessary and further that it is not for a public use as required by U. S. Const. Amend. XIV, as well as Minn. Const. art. 1, § 13. They further assert L. 1955, c. 757, amending M. S. A. 308.05, which purports to authorize the right of eminent domain, is unconstitutional as applied to the petitioner, Dairyland Power Cooperative.

The Dairyland Power Cooperative is a nonprofit cooperative association originally incorporated under the laws of the State of Wisconsin and is qualified under the laws of the State of Minnesota pursuant to provisions contained in M. S. A. 308.05 to 308.18 to engage in the electric heat, light, and power business. Dairyland is commonly known as a "federated" or "central" cooperative, in that its membership consists solely of member cooperatives, commercial public utilities, and municipalities. It was organized primarily to serve as a corporate vehicle in performing the specialized function of furnishing at wholesale electric energy to member cooperatives who in turn distribute the energy at a lower voltage to ultimate consumers. While its articles and bylaws do not forbid it, presently it has no individual or ultimate consumers. Its membership consists of 26 member rural electric distribution cooperatives, all

REA financed, which in turn distribute and furnish electricity to over 92,000 farms, homes, rural establishments, and small rural cities and villages in the four-state area of Minnesota, Wisconsin, Iowa, and Illinois. In addition Dairyland furnishes some electric energy at wholesale to six members which are commercial public utilities in its area. It has recently contracted to furnish supplementary and standby electric service to the city of Rochester, Minnesota.

It appears from the record that Dairyland owns and operates a large, modern, and integrated generation and transmission system which includes three steam generating stations on the Mississippi River, four hydroelectric generating stations on the Flambeau River, as well as Diesel generating stations at Chippewa Falls, Wisconsin, and at Twin Lakes near Albert Lea, Minnesota. These generating stations are all interconnected through a network of 2,250 miles of transmission line with eleven transmission substations and six generating plant substations. Its facilities extend through 44 different counties, including seven counties in the State of Minnesota.

In connection with Dairyland's character as a public utility, it is important to note that since the fall of 1955 its system has been interconnected with the large integrated systems of the Northern States Power Company and Interstate Power Company in what is designated as "a power pool," the practical effect of which is that all three participants may be operated as one combined system. It is reputed to be the largest cooperatively owned electric generation and transmission system in the world. Its facilities have been constructed through loans from the Federal government, acting through the Administrator of the REA, under and pursuant to the terms of the Rural Electrification Act of 1936.

During the year 1955, Dairyland accepted as its 26th member the People's Cooperative Power Association of Rochester, Minnesota. This cooperative, which is REA financed and serves 5,208 ultimate consumers in rural areas throughout Olmsted and Wabasha Counties and in portions of four other counties in southeastern Minnesota, operates 1,988 miles of distribution lines and has seven distribution substations. People's Cooperative, which started operations in 1938,

has purchased all of its power requirements from the city of Rochester which owns, operates, and maintains a municipal generating plant. Early in 1955, officials of the city advised the People's Cooperative that it would have to look for another source of power because its limited capacity was needed for its own municipal uses and it could no longer spare the power it had been selling to it. As a consequence the People's Cooperative sought the service of Dairyland's facilities and upon application was accepted as a member of its group.

After Dairyland had accepted People's Cooperative as a member, it instituted these proceedings to acquire by condemnation right-of-way easements for its electric transmission lines so as to connect its facilities between Dairyland's principal generating plant at Alma, Wisconsin, and the substation near Rochester, Minnesota. The proposed line will serve the further purpose of improving service with two other member cooperatives in southern Minnesota.

The new line from Alma, Wisconsin, to the substation at Rochester, Minnesota, is approximately 31.6 miles. Dairyland has negotiated right-of-way easements of approximately 22.5 miles by voluntary purchase and has completed condemnation proceedings through award or settlement of approximately 3.75 miles. The right-of-way easements sought in these actions are all that are required to complete the remaining 5.4 miles of line.

Since the sovereign right of eminent domain can be exercised only for a public use, the property owners argue that the proposed condemnation is unlawful because Dairyland is a cooperative organized to furnish service to members only. They argue that the general public must have a definite and established right to use of the property appropriated, not as a matter of favor or by consent of the owner, but as a matter of right; and if a special benefit to be derived from the land sought to be appropriated is wholly for private persons, the use is a private one and not made a public use by the fact that the public has a theoretical right to use it.

They specifically urge that the proposed taking of their property is not for public use within the meaning of that term as expressed

in Minn. Const. art. 1, § 13, and is in violation of the due process provisions of U. S. Const. Amend. XIV. They further urge that L. 1955, c. 757, amending M. S. A. 308.05, which purports to empower cooperatives organized or qualified under §§ 308.05 to 308.18 and "engaged in the electrical, heat, light, power or telephone business, * * * to exercise the power of eminent domain in the manner provided by the laws of this state for the exercise of such power by other corporations engaged in such business," is unconstitutional as applied to the property owners because the proposed taking is not for a public use.

■ Much of the landowners' argument is directed to the articles of incorporation of the Dairyland Cooperative. They emphasize that under Art. 5 of the articles of incorporation, which states the nature of the business, provision is made for the furnishing of electrical energy "to member distribution cooperatives and to member public utilities" and for the sale of energy "to its members only." Citing Garkane Power Co. Inc. v. Public Service Comm. 98 Utah 466, 100 P. (2d) 571, 132 A. L. R. 1490, they contend that, even though the entire public of a certain area has been solicited for membership in a cooperative furnishing service to members only, that fact does not make it a public utility where the service is limited to actual members and the cooperative reserves the right to select its members.

The Supreme Court of Wyoming in an exhaustive and well-considered case (Rural Elec. Co. v. State Board of Equalization, 57 Wyo. 451, 120 P. [2d] 741, 122 P. [2d] 189) had occasion to examine the various aspects of the operation of an electric cooperative and discussed at length the articles of incorporation relating to membership as well as the actual functions of the cooperative upon the issue of whether or not the cooperative was in fact a public utility. That case involved a general sales tax passed by the legislature of the State of Wyoming applicable to (Laws of Wyoming 1937, c. 102, § 4[b]) "public utilities, gas, electric, and heat corporation * * * whether * * * municipally or privately owned, * * *." The state board of equalization claimed the electric cooperative involved was subject to the tax. The cooperative brought an action in behalf of

itself and other cooperatives similarly situated for a declaratory judgment to the effect that they were not subject to the tax, claiming they were not public utilities within the purview of the statute. The court observed that the business of supplying electricity has long been and (57 Wyo. 471, 120 P. [2d] 747) "now is universally recognized as a service in which the public may be interested, and which, accordingly, may be impressed with a public character, in the absence of countervailing reasons." The wishes and declarations of the owner do not determine the public character of the business. Quoting from Clarksburg Light & Heat Co. v. Public Service Comm. 84 W. Va. 638, 645, 100 S. E. 551, 554, the court said (57 Wyo. 478, 120 P. [2d] 749):

"The fact that the conduct of any particular enterprise may have in the remote or even recent past been considered as entirely the subject of private contract, while persuasive of the private character of the business, is not at all conclusive."

What constitutes a public utility depends upon the particular facts in each case. In determining that the cooperative was in fact a public utility, the Supreme Court of Wyoming took into consideration the circumstance that the cooperative had indiscriminately served and solicited the people of the community in which it operated; that it had a monopoly in the territory in which it furnished services; that it had contact with a public utility and ability to compete in the area in which it operated; and among other things that it had the power of eminent domain which was indicative of its character as a public utility.

Applying the same criteria to the facts contained in the record before us, we are forced to reach a similar conclusion. The record contains these persuasive facts:

(a) While the articles of incorporation and bylaws of Dairyland provide for the furnishing of service to "members only" and make membership applications subject to acceptance by its board of directors, the established policy and consistent practice of Dairyland has been to extend electric service to all distribution rural electric cooperatives within its service area and to accept without discrimina-

tion applications for membership from all such cooperatives which desire and need the service. At no time has the board of directors of Dairyland failed to accept any application for membership and extend service to and interconnect with any system of any rural electric cooperative commercial or municipally owned public utility which could be served under the provisions of the Rural Electrification Act of 1936 as amended.

(b) The loan contracts between the United States and the member distribution cooperatives require, as borrowers from the Federal government, that they extend service on an area-coverage basis. Section 6 of Art. 4 of the contract provides that the borrower "shall make diligent effort to extend electric service to all unserved persons within the service area of the Borrower who (a) desire such service and (b) meet all reasonable requirements established by the Borrower as a condition of such service."

(c) Dairyland has been interconnected with the systems of the Northern States Power Company and Interstate Power Company at various points in Wisconsin and Minnesota in what is denominated in utility language as "a power pool" making it part of a large integrated system on the same basis as other competitors who are public utilities.

(d) The legislature has recognized the public utility nature of rural electric cooperatives by granting to them, pursuant to L. 1955, c. 757, amending § 308.05, the right of eminent domain.

The following rule is set forth in 43 Am. Jur., Public Utilities and Services, § 6:

"* * * the mere fact that the charter or bylaws of a membership or co-operative organization prohibit it from serving other than its own members or engaging in business as a public utility is not determinative of whether it is a public utility, for it is what the organization actually does that determines that question."

We think that on the record the evidence overwhelmingly establishes that Dairyland is, both in the fabric of its organization and in the functions it performs, a public utility in fact.

564

■ The landowners next contend that the Dairyland cannot be a cooperative corporation and at the same time have delegated to it the right of eminent domain as L. 1955, c. 757, amending § 308.05, attempts to do. They argue that a cooperative exists solely for the benefit of its members, that its purposes are private, and that a law which purports to delegate to such a cooperative corporation the right of eminent domain with the privilege of taking private property for a private use is unconstitutional.

In Bookhart v. Central Elec. Power Co-op. Inc. 219 S. C. 414, 65 S. E. (2d) 781, the court had for consideration the constitutionality of an act granting to an electric cooperative the right of eminent domain similar to the act which is challenged here. That case involved an electric cooperative which had 14 distribution members and was also financed by the Rural Electrification Administration. The act in question granted to the cooperative the power "To exercise the power of eminent domain in the manner provided by the laws of this State for the exercise of that power by corporations constructing or operating electric transmission and distribution lines or systems" and "To do and perform any and all other acts and things, and to have and exercise any and all other powers which may be necessary, convenient or appropriate to accomplish the purpose for which the cooperative is organized."[1] In answering the constitutional objection based upon the claim that the service rendered by the cooperatives was limited to its members, the court said (219 S. C. 422, 65 S. E. [2d] 784) :

"* * * Implicit in the purpose for which cooperatives are authorized by the Act, that 'of supplying electric energy and promoting and

[1]Code of Laws of South Carolina 1952, § 12-1025(1), includes the express power "To generate, manufacture, purchase, acquire, accumulate and transmit electric energy and to distribute, sell, supply and dispose of electric energy in rural areas to its members, to governmental agencies and political subdivisions and to other persons not in excess of ten per cent of the number of its members." Since we hold that an electric cooperative which chooses to exercise the right of eminent domain commits itself to admit to membership all users without arbitrary or unreasonable limitations, we do not consider the 10-percent provision above noted as a material distinction.

extending the use thereof in rural areas,' is the obligation of such corporations to make membership available, without arbitrary or unreasonable limitations thereon, to all coming within the purview of that purpose."

Following the manifest intention of the legislature the court held that the cooperative was public in its nature and purpose with the express power of eminent domain which resulted in the obligation to reasonably render nondiscriminatory service.

We agree with the statement of the South Carolina court. In conferring the right of eminent domain the legislature must be given credit for intending not to violate the due process clause of the constitution by conferring such power on a corporation for private use. It is contemplated that all of the inhabitants in the territory shall be eligible to obtain the service by complying with reasonable conditions. Having endowed the cooperative with the power of eminent domain the legislature has at the same time imposed upon it the responsibility to reasonably furnish nondiscriminatory service to its members, the members, of course, being the public in the area served. Where the legislature has set up authority for a cooperative and clothed it with a public interest, it has control over it by present and future legislation such as is ordinarily applicable to a utility. Capital Elec. Power Assn. v. McGuffee (Miss.) 83 So. (2d) 837, citing the Bookhart case, held that an electrical cooperative with the power of eminent domain organized to serve its members must accept all applicants without discrimination.

■ Moreover, the legislature is aware of the growth and development of cooperatives and their present-day importance. Judicial restraint demands a deference to the will of the legislature which requires that we assume it intended the power granted should be exercised for a public purpose within the framework of the constitution. Courts will hold the use public unless it manifestly appears by the provisions of the act that it can have no tendency to advance and prosecute such public use. State ex rel. Twin City B. & I. Co. v. Houghton, 144 Minn. 1, 174 N. W. 885, 176 N. W. 159, 8 A. L. R. 585.

■ While the specific question before us has not previously been presented to this court, we are constrained to adopt the reasoning of the Wyoming and South Carolina cases in light of the decisions of our own court in which the import of the term "public use" has been considered. In State ex rel. Twin City B. & I. Co. v. Houghton, 144 Minn. 1, 16, 174 N. W. 885, 176 N. W. 159, 161, 8 A. L. R. 585, 588, we said:

"The notion of what is public use changes from time to time. Public use expands with the new needs created by the advance of civilization and the modern tendency of the people to crowd into large cities."

And in Stewart v. G. N. Ry. Co. 65 Minn. 515, 517, 68 N. W. 208, 209, 33 L. R. A. 427, 429, we said:

"* * * The term 'public use' is flexible, and cannot be limited to the public use known at the time of the forming of the constitution."

■ The property owners contend that this court is committed to the narrow "public use" test as enunciated in Minnesota Canal & Power Co. v. Koochiching Co. 97 Minn. 429, 107 N. W. 405, 5 L.R.A. (N.S.) 638, under which test the public as such must have the right to use the property taken. They distinguish the more recent case of Thomas v. Housing & Redevelopment Authority of Duluth, 234 Minn. 221, 48 N. W. (2d) 175, where we upheld the constitutionality of the use of eminent domain in a slum clearance and public housing development project, by arguing that the right to condemnation rested upon the exercise of police power in the interest of public health, safety, and general welfare.[2] The petitioner on the other hand argues that the narrow "public use" test set forth in the Minnesota Canal case was at most dicta and that in any event that test has been rejected or impliedly overruled by this court in the

[2]The distinction between eminent domain and police power is discussed in 29 C. J. S., Eminent Domain, § 6.

Thomas case where we approved the taking under the broader "public benefit" test.[3]

We have no difficulty in reconciling these two decisions insofar as they may have a bearing on the issue before us. By holding in the Thomas case that the public benefit to be derived from slum clearance and public housing constituted a public use which under the circumstances warranted the exercise of eminent domain, we did not reject or overrule the basic doctrine that the sovereign right of eminent domain may not be delegated except in prosecution of a use which is at least predominantly a public use. In the Minnesota Canal case it was clear that the use sought would have resulted in a private benefit which clearly dominated the public interest. As applied to the facts before it, we think that the statement of the court on the subject of public use in the Minnesota Canal case still retains vitality and significance.

■ The property owners have urged that because Dairyland is a wholesale supplier and does not normally render service to ultimate consumers it is therefore not serving the public and is not entitled to exercise the power of eminent domain. This is in accord with Avery v. Vermont Elec. Co. 75 Vt. 235, 54 A. 179, 59 L. R. A. 817, but we think that case clearly expressed a minority view and is contrary to authorities found in Annotation, 44 A. L. R. 735, following the case of Nichols v. Central Virginia Power Co. 143 Va. 405, 130 S. E. 764, 44 A. L. R. 727. We think the better rule, and the one which we follow, is found in 18 Am. Jur., Eminent Domain, § 67, as follows:

"* * * If the ultimate use is public, it is immaterial that condemnation is sought by an intermediate agency which is to distribute the electricity to independent lighting or power companies or by a company, organized to furnish electric power, to reach a source from

---

[3]The shifting trends of authorities between the so-called "public use" test and the "public benefit" theory are discussed in Nichols, *The Meaning of Public Use in the Law of Eminent Domain*, 20 Boston U. L. Rev. 615, 58 Yale L. J. 599, and Fain, *The Use of the Power of Eminent Domain by Missouri Electric Cooperatives*, 17 Mo. L. Rev. 159, 175 to 176.

which it will purchase electric current for distribution and resale to its customers."

The operations of Dairyland should be viewed as a whole in the light of its functions and relations to the member cooperatives who depend upon it for their supply of electric energy, and the fact that it does not directly come in contact with the ultimate consumer does not deprive it of its character as a public utility. Nor can we ignore the needs and interests of the thousands of consumers who rely upon Dairyland for the electrical energy they use.

■ Further pressing their argument that Dairyland is neither a public service corporation nor a public utility, the landowners cite Garkane Power Co. Inc. v. Public Service Comm. 98 Utah 466, 100 P. (2d) 571, 132 A. L. R. 1490; San Miguel Power Assn. v. Public Service Comm. 4 Utah (2d) 252, 292 P. (2d) 511; and State v. P. K. M. Elec. Co-op. Inc. 242 Minn. 404, 65 N. W. (2d) 871. In the Garkane case, the sole issue before the court was whether the cooperative in question was a public utility within the meaning of the statutes conferring on the commission regulatory jurisdiction over public utilities. The San Miguel case involved the question whether electric cooperatives, as a matter of right, could intervene before the public service commission to oppose the granting of a certificate of convenience and necessity to a commercial public utility which was subject to the jurisdiction of the commission. The P. K. M. Elec. Co-op. case involved the interpretation of a tax statute. The issue before this court is whether the plaintiff is a public service corporation in the sense that it can constitutionally be granted the power of eminent domain. We are not concerned with the meaning of "public service corporation" or "public utility" in a statute defining the regulatory jurisdiction of a public service commission or in a tax statute.

Whether electrical cooperatives need any regulation and the type of regulation that should be imposed are matters for determination by the legislature.

■ We have heretofore indicated that Dairyland is in fact a public service corporation empowered by statute to exercise the right of

eminent domain subject to the implied obligation to make membership available without arbitrary or unreasonable limitation to all coming within the purview of the purpose for which it is created. We think the right of exercise of eminent domain may also be invoked under authority of Thomas v. Housing & Redevelopment Authority of Duluth, 234 Minn. 221, 48 N. W. (2d) 175, because the ultimate purpose to be served through the benefits of rural electrification is that of promoting the general health, comfort, and safety of the general public. The economic, safe, and healthy production of dairy and other farm products is to a very substantial degree dependent upon reliable electric service furnished by REA cooperatives. Today farmers and other persons living and producing goods in rural areas are largely dependent upon a reliable supply of electric energy for their living and for the production of goods and income. Modern water and sewage systems have been installed. Persons in rural areas depend upon an uninterrupted and reliable supply of electricity to heat their homes, to cook their food, to provide light, to pump water, to grind feed for their cattle, to milk their cows, to rapidly cool their milk so that it can meet health standards imposed by urban markets, and to do the numerous other things that are done today on modern farms and in modern rural homes and industries through the use of electricity.

■ The landowners also assert that this condemnation was not necessary as required by § 222.36. There is ample evidence in the record to support the court's findings on this issue. There is an urgency here created by the fact that the city of Rochester can no longer continue furnishing wholesale power to People's Cooperative and it is necessary for People's to make arrangements for another source of supply. The trial court has found:

"* * * To obtain service to meet its immediate requirements from Northern States Power Company and Interstate Power Company would involve the construction of a total of approximately twenty miles of transmission line by People's and the construction of two substations at an estimated cost to People's of $500,000.00. The cost of the proposed 161,000-volt transmission line from Alma to Roch-

ester and the conversion substation at Rochester proposed to be constructed by petitioner [Dairyland] would be borne entirely by petitioner in accordance with standard policies of service to its member cooperatives."

With reference to the location the trial court found:

"The location of the proposed line diagonally over and on the land of respondent landowners is made necessary by the overall layout and design of the line running diagonally and southwesterly from Alma to Rochester in a comparatively straight, or tangent, line. This tangent layout of the line from Alma to Rochester and across respondent's land is made necessary by sound engineering construction, economy, load-carrying capacity and maintenance feasibility. To construct the line solely along the North and South and East and West fence and section lines from Alma to Rochester would require approximately thirteen more miles of line, would reduce the carrying capacity of the line from an estimated 100,000 KW to approximately 70,000 KW, would cost an estimated $221,000.00 more to originally construct (at an estimated rate of $17,000.00 per mile), and would create not only greater exposure to outage creating weather elements, but would also create proportionately additional maintenance expense for the future."

In Northern States Power Co. v. Oslund, 236 Minn. 135, 51 N. W. (2d) 808, 52 N. W. (2d) 717, we held that there is no need for a showing of absolute necessity but only that the proposed taking is reasonably necessary or convenient to the end in view.

Affirmed.