RICHARD J. THOMAS AND ANOTHER v.
HOUSING AND REDEVELOPMENT AUTHORITY
OF DULUTH AND ANOTHER.[1]

May 25, 1951.

No. 35,444.

[1]Reported in 48 N. W. (2d) 175.

222

*Lewis, Hammer & Heaney* and *L. Dale MacIver,* for appellants.

*Paul R. Hamerston,* for respondent Housing and Redevelopment Authority of Duluth.

*Harry Weinberg,* City Attorney, and *Runar C. Erickson,* Assistant City Attorney, for respondent City of Duluth, Minnesota.

*J. A. A. Burnquist,* Attorney General, and *George B. Sjoselius,* Deputy Attorney General, joined in and adopted the brief of respondents.

*Ben W. Palmer,* for Housing and Redevelopment Authority of Minneapolis, Minnesota; *Ira Karon,* for Housing and Redevelopment Authority of St. Paul, Minnesota; and *Howard Siegel,* for Housing and Redevelopment Authorities of Chisholm and Hibbing, Minnesota, as *amici curiae,* joined in the brief of respondents.

FRANK T. GALLAGHER, JUSTICE.

Appeal from a judgment of the district court.

Richard J. Thomas and Esther G. Thomas, his wife, instituted proceedings in the district court of St. Louis county to restrain the Housing and Redevelopment Authority of Duluth, Minnesota, and the city of Duluth from proceeding with a program of action intended to culminate in the establishment of a low-rent housing development at Duluth in conformity with federal and state law.

The facts, as stipulated between the parties, are undisputed. The issues raised by the pleadings are as to the law only, and particularly the constitutionality of the Municipal Housing and Redevelopment Act, being L. 1947, c. 487, as amended by L. 1949, c. 505

(M. S. A. 462.411, *et seq.*), referred to hereinafter as the act. The stipulated facts are substantially as follows:

Plaintiffs are citizens, residents, taxpayers, and owners of real estate in Duluth. The Housing and Redevelopment Authority of Duluth, referred to hereinafter as the Authority, is a public body corporate and politic created pursuant to M. S. A. 462.425. On August 22, 1949, the Authority applied to the Public Housing Administration, a federally owned corporation (hereinafter referred to as the PHA), for a preliminary loan under the provisions of the United States Housing Act of 1937, as amended (42 USCA, § 1401, *et seq.*), referred to hereinafter as the federal act, in the amount of $150,000, to be used for the purpose of preliminary surveys in the planning of a proposed low-rent housing project or projects in the city of Duluth consisting of 500 dwelling units. The application was approved by a resolution of the city council on August 29, 1949. Thereafter, the Authority entered into a preliminary loan contract with the PHA, pursuant to which contract the PHA advanced $14,000 to the Authority, evidenced by a note executed by the Authority and payable to the PHA. On April 10, 1950, the Authority and the city of Duluth entered into a cooperation agreement, made a part of the stipulated statement of facts, which provides in part:

"Now, THEREFORE, in consideration of the mutual covenants hereinafter set forth, the Local Authority and the City do agree:

\* \* \* \* \*

"2. The Local Authority shall endeavor to secure a contract or contracts with the PHA for loans and annual contributions, and undertake to develop and administer one or more Projects.

"3. Under the constitution and statutes of the State of Minnesota, all Projects are exempt from all real and personal property taxes and special assessments levied or imposed by any Taxing Body; and, with respect to any Project, so long as either (a) any contract between the Local Authority and the PHA for loans or annual contributions, or both, in connection with such Project shall remain in force and effect, or (b) any bonds issued in connection

with such Project shall remain outstanding, whichever period is the longer, the City agrees that it will not levy or impose any real or personal property taxes or special assessments upon such Project or upon the Local Authority with respect thereto. During such period, the Local Authority shall make annual payments (herein called 'Payments in Lieu of Taxes') in lieu of taxes and special assessments, except insofar as payment of special assessments may be governed by Section 6, Subdivisions (b) and (c) hereof, and in payment for public services and facilities furnished for or with respect to such Project. Each such annual Payment in Lieu of Taxes shall be made at the time when real property taxes on such Project would be paid if it were subject to taxation, and shall be in an amount equal to ten per cent (10%) of the aggregate Shelter Rent charged by the Local Authority in respect to such Project during the tax year for which such payment is made; provided, however, that upon failure of the Local Authority to make any such Payment in Lieu of Taxes, no lien against any Project or assets of the Local Authority shall attach.

"The payments in lieu of taxes shall be collected and distributed in accordance with Section 34, Subdivision 3 of the Minnesota Municipal Housing and Redevelopment Act, as amended (together with any amendments thereto enacted after the date of this Agreement); provided, however, that no payment for any year shall be made to any Taxing Body (including the City) in excess of the amount of the real property taxes which would have been paid to such Taxing Body for such year if the Project were not exempt from taxation.

"4. The City agrees that, subsequent to the date of initiation (as defined in the Act) of each Project and within five years after the completion thereof, or such further period as may be approved by the PHA, there has been or will be elimination (as approved by the PHA) by demolition, condemnation, effective closing, or compulsory repair or improvement, of unsafe or insanitary dwelling units situated in the locality or metropolitan area of the City substan-

tially equal in number to the number of newly constructed dwelling units provided by such Project; provided, that, where more than one family is living in an unsafe or insanitary dwelling unit, the elimination of such unit shall count as the elimination of units equal to the number of families accommodated therein; and provided, further, that this paragraph 4 shall not apply in the case of (a) any Project developed on the site of a Slum cleared subsequent to July 15, 1949, and that the dwelling units eliminated by the clearance of the site of such Project shall not be counted as elimination for any other Project or any other low-rent housing project, or (b) any Project located in a rural non-farm area.

"5. During the period commencing with the date of the acquisition of any part of the site or sites of any Project and continuing so long as either (a) any contract between the Local Authority and PHA for loans or annual contributions, or both, with respect to such Project shall remain in force and effect, or (b) any bonds issued in connection with such Project shall remain outstanding, whichever period is the longer, the City, without cost or charge to the Local Authority or the tenants of such Project (other than the Payments in Lieu of Taxes) shall:

"(a) furnish or cause to be furnished to the Local Authority and the tenants of such Project (i) the public services and facilities which are at the date hereof being furnished without cost or charge to other dwellings and inhabitants in the City, including but not limited to: educational, fire, police and health protection and services; maintenance and repair of public streets, roads, alleys, sidewalks, sewer and water systems; snow removal; street lighting on public streets and roads within such Project and on the boundaries thereof; and sewer services for such Project; and (ii) also such additional public services and facilities as may from time to time hereafter be furnished without cost or charge to other dwellings and inhabitants of the City;

"(b) insofar as the City may lawfully do so, vacate such streets, roads and alleys within the area of such Project as may be necessary

in the development thereof, and convey without charge to the Local Authority such interest as the City may have in such vacated areas; and insofar as it is lawfully able to do so without cost or expense to the Local Authority and/or to the City, cause to be removed from such vacated areas, insofar as it may be necessary and feasible, all public or private utility lines and equipment;

"(c) insofar as the City may lawfully do so, grant such waivers of the building code of the City as are reasonable and necessary to promote economy and efficiency in the development and administration of such Project; and insofar as the City may lawfully do so, make such changes in any zoning of the site and surrounding territory of such Project as are reasonable and necessary for the development and protection thereof;

"(d) accept grants of easements necessary for the development of such Project; and

"(e) cooperate with the Local Authority by such lawful action or ways as the City and the Local Authority may find necessary in connection with the development and administration of such Project.

"6. In respect to any Project the City further agrees that within a reasonable time after receipt of a written request therefor from the Local Authority;

"(a) it will accept dedication of all interior street, roads, alleys, adjacent sidewalks, and sewer and water facilities within said streets, roads and alleys, within the area of such Project after the Local Authority, at its own expense, has completed the grading, improvement, and paving thereof, and the installation of said sewer and water facilities in accordance with specifications acceptable to the City; and

"(b) it will accept necessary dedications of land for, and will grade, improve, pave, and provide sidewalks for, all streets bounding such Project or necessary to provide adequate access thereto (in consideration whereof the Local Authority shall pay to the City such amount as would be assessed against the Project site for such work if it were privately owned).

"(c) it will provide, or cause to be provided, water mains, and storm and sanitary sewers, leading to such Project and serving the bounding streets thereof (in consideration whereof the Local Authority shall pay to the City such amount as would be assessed against the Project site if it were privately owned).

"7. If the City shall, within a reasonable time after written notice from the Local Authority, fail or refuse to furnish or cause to be furnished any of the services or facilities which it is obligated hereunder to furnish or cause to be furnished to the Local Authority or to any Project, then the Local Authority may proceed to obtain such services or facilities elsewhere, and deduct the cost therefor from any Payments in Lieu of Taxes due or to become due to the City in respect to any Project or any other low-rent housing projects assisted or owned by the PHA.

\*   \*   \*   \*   \*

"9. So long as any contract between the Local Authority and the PHA for loans (including preliminary loans) or annual contributions, or both, with respect to any Project shall remain in force and effect, or so long as any bonds issued in connection with such Project shall remain outstanding, this Agreement shall not be abrogated, changed, or modified without the consent of the PHA. The privileges and obligations of the City hereunder shall remain in full force and effect with respect to each Project so long as the beneficial title to such Project is held by the Local Authority or some other public body or governmental agency, including the PHA, authorized by law to engage in the development or administration of low-rent housing projects. If at any time the beneficial title to, or possession of, any Project is held by such other public body or governmental agency, including the PHA, the provisions hereof shall inure to the benefit of and may be enforced by, such other public body or governmental agency, including the PHA."

On March 8, 1950, the city of Duluth passed an ordinance authorizing the execution of the cooperation agreement and approving the

low-rent housing project in accordance with the provisions of L. 1947, c. 487, art. IV, § 12.

It is contemplated that the Authority will, unless restrained, enter into a contract with the PHA in which the PHA will agree to loan to the Authority the approximate sum of $2,000,000, being 90 percent of the cost of acquisition and construction of the proposed low-rent housing project. The proposed contract also provides that the PHA will make annual contributions to the Authority over a period of not to exceed 40 years in an amount not to exceed four and one-half percent of the total cost of the development project. The proposed loan will be secured by a pledge of revenues derived from the operation of the project and by a pledge of the annual contributions made for such project by the federal government. The loans will be converted into definitive bonds at or near the completion of the project, subject to the terms of M. S. A. 462.551, which provides that the bonds and other obligations of the Authority shall not be a debt of the municipality or the state or any political subdivision thereof, and neither the municipality nor the state or any political subdivision thereof shall be liable thereon, nor in any event shall such bonds or obligations be payable out of any funds or properties other than those of the Authority. The federal act provides (42 USCA, § 1410 [a]) that the PHA shall not make any contract for loans (other than preliminary loans) or for annual contributions with respect to any low-rent housing project initiated after March 1, 1949, unless the governing body of the locality involved has entered into an agreement with the public housing agency providing that subsequent to the initiation of the project and within five years after the completion thereof there has been or will be elimination by demolition, condemnation, effective closing, or compulsory repair or improvement of unsafe or insanitary dwelling units situated in the locality or metropolitan area substantially equal in number to the number of newly constructed dwelling units provided by such project; provided that such elimination may, in the discretion of the PHA, be deferred in any locality or metropolitan

area where there is an acute shortage of decent, safe, or sanitary housing available to families of low income. The federal act further provides (42 USCA, § 1415[7][b]) that the PHA shall not make any contract for loans (other than preliminary loans) or for annual contributions to any low-rent housing project initiated after March 1, 1949, unless the governing body of the locality involved has entered into an agreement with the public housing agency providing for the local cooperation required by the PHA pursuant to the federal act.

The federal act provides (42 USCA, § 1410[g]) that every contract made pursuant thereto for annual contributions for any low-rent housing project shall require that as among low-income families the public housing agency shall extend preferences in the selection of tenants:

"First, to families which are to be displaced by any low-rent housing project or by any public slum-clearance or redevelopment project initiated after January 1, 1947, or which were so displaced within three years prior to making application to such public housing agency for admission to any low-rent housing; and as among such families first preference shall be given to families of disabled veterans whose disability has been determined by the Veterans' Administration to be service-connected, and second preference shall be given to families of deceased veterans and servicemen whose death has been determined by the Veterans' Administration to be service-connected, and third preference shall be given to families of other veterans and servicemen;

"Second, to families of other veterans and servicemen and as among such families first preference shall be given to families of disabled veterans whose disability has been determined by the Veterans' Administration to be service-connected, and second preference shall be given to families of deceased veterans and servicemen whose death has been determined by the Veterans' Administration to be service-connected."

The term "veteran" as defined by the federal act (42 USCA, § 1402[14]) shall mean a person who has served in the active military or naval service of the United States at any time on or after September 16, 1940, and prior to July 26, 1947, or at any time on or after April 6, 1917, and prior to November 11, 1918, and who shall have been discharged or released under conditions other than dishonorable. The term "serviceman" is thereby defined (§ 1402[14]) to mean a person in the active military or naval service of the United States who has served therein on or after September 16, 1940, and prior to July 26, 1947, or at any time on or after April 6, 1917, and prior to November 11, 1918.

It is contemplated that the Authority, unless enjoined, will construct in the city of Duluth 200 housing units to be rented to families of low income, as defined by the act, and will acquire land which is *not* a slum site, by condemnation or eminent domain, on which to construct the housing units, and that the Authority will proceed to negotiate with the PHA and will execute the proposed contract hereinbefore referred to. Any private property acquired by the Authority for its housing site will be removed from the tax rolls.

The trial court made findings of fact and conclusions of law in favor of defendants. This appeal is from the judgment entered pursuant thereto.

Plaintiffs contend that the proceedings sought to be enjoined are violative of Minn. Const. art. 1, §§ 2, 7, 13; art. 3, § 1; art. 4, § 27; art. 9, § 1; and U. S. Const. Amend. XIV.

Apart from the constitutional objections, plaintiffs contend (1) that the approval by the city of Duluth of the proposed project does not comply with M. S. A. 462.465, subd. 1; (2) that the priority to be given by the Authority to displaced families will violate the veterans' priority of the act; and (3) that the priority to be given by the Authority to veterans of World War I will violate the priority to be given to World War II veterans only.

Before going into a discussion of the legal questions involved in this case, it is apparent that the purpose of the Municipal Housing

and Redevelopment Act (M. S. A. 462.411, *et seq.*) is to establish housing and redevelopment authorities in municipalities throughout Minnesota which can undertake public housing and slum clearance projects in cooperation with the PHA under the federal act (42 USCA, § 1401, *et seq.*). In this connection, the trial court commented in its memorandum:

"The federal enactment and the state statute are therefore companion legislation designed to accomplish through the instrumentality of public agencies, the elimination in Minnesota of unsafe and inadequate dwellings and to substitute in their stead decent habitations for persons heretofore compelled to live under slum conditions, with a preference for veterans and servicemen and their families who are of low income. The statute strikes at the existence of slums which encourage the spread of disease, impair the public health and morals, increase the hazards of fires, accidents and other calamities, increase violations of the law, and jeopardize the safety and well being of the state, thus necessitating the expenditure of vast sums of public money both by the state and local subdivisions for the purpose of public relief, health, crime prevention, punishment and correction, and fire and accident prevention."

By way of a brief reference to the legislative background to which the Authority traces its existence, it appears that when in 1937 congress enacted the federal act it declared that it is (42 USCA, § 1401)—

"the policy of the United States to promote the general welfare of the Nation by employing its funds and credit, as provided in this chapter, to assist the several states and their political subdivisions to alleviate present and recurring unemployment and to remedy the unsafe and insanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of low income, in rural or urban communities, that are injurious to the health, safety, and morals of the citizens of the Nation." Housing Authority v. Dockweiler, 14 Cal. (2d) 437, 441, 94 P. (2d) 794, 796.

■ Plaintiffs contend in substance that property acquired for building low-rent housing under the act is not taken for public use, and they attack the right of the Authority to exercise the power of eminent domain. On the other hand, defendants maintain that this right of the Authority is beyond doubt, since it is a necessary part of the whole purpose of the act, and they cite authorities, hereinafter referred to, in many jurisdictions sustaining similar powers by housing authorities.

Minn. Const. art. 1, § 13, provides:

"Private property shall not be taken, destroyed or damaged for public use without just compensation therefor, first paid or secured."

Plaintiffs argue in effect that this section limits the state's power of eminent domain to those instances where the contemplated use is public in character; that the proposed use of the land to be condemned as a site for public housing does not meet this test because the homes to be built and the class of persons eligible for occupancy are limited.

The right of the Authority to exercise the power of eminent domain in furtherance of public uses set out by the legislature in the enactment of the act would appear to be without doubt, in view of previous decisions of this court and the long line of decisions from many other states which have sustained the power of eminent domain in substantially the same kind of cases as the one at bar. Seldom have we had a case before us where so many cases from other jurisdictions have been cited sustaining comparable powers by housing authorities. All of these cases specifically recognize the principle that public housing and slum clearance are public uses for which the power of eminent domain may be exercised. See, Matter of New York City Housing Authority v. Muller, 270 N. Y. 333, 1 N. E. (2d) 153, 105 A. L. R. 905; In re Opinions of the Justices, 235 Ala. 485, 179 So. 535; Marvin v. Housing Authority of Jacksonville, 133 Fla. 590, 183 So. 145; Williamson v. Housing Authority of Augusta, 186 Ga. 673, 199 S. E. 43; Krause v. Peoria Housing Authority, 370 Ill. 356, 19 N. E. (2d) 193; Edwards v. Housing

Authority of City of Muncie, 215 Ind. 330, 19 N. E. (2d) 741; Spahn v. Stewart, 268 Ky. 97, 103 S. W. (2d) 651; State ex rel. Porterie v. Housing Authority of New Orleans, 190 La. 710, 182 So. 725; Rutherford v. City of Great Falls, 107 Mont. 512, 86 P. (2d) 656; Housing Authority v. Dockweiler, 14 Cal. (2d) 437, 94 P. (2d) 794; Wells v. Housing Authority of City of Wilmington, 213 N. C. 744, 197 S. E. 693; Dornan v. Philadelphia Housing Authority, 331 Pa. 209, 200 A. 834; McNulty v. Owens, 188 S. C. 377, 199 S. E. 425; Knoxville Housing Authority, Inc. v. City of Knoxville, 174 Tenn. 76, 123 S. W. (2d) 1085; Chapman v. Huntington, West Virginia, Housing Authority, 121 W. Va. 319, 3 S. E. (2d) 502; Allydonn Realty Corp. v. Holyoke Housing Authority, 304 Mass. 288, 23 N. E. (2d) 665; Stockus v. Boston Housing Authority, 304 Mass. 507, 24 N. E. (2d) 333; In re Brewster Street Housing Site, 291 Mich. 313, 289 N. W. 493; Laret Investment Co. v. Dickmann, 345 Mo. 449, 134 S. W. (2d) 65; Romano v. Housing Authority of City of Newark, 123 N. J. L. 428, 10 A. (2d) 181, affirmed, 124 N. J. L. 452, 12 A. (2d) 384; Keyes v. United States, 73 App. D. C. 273, 119 F. (2d) 444. Space will not permit, however interesting and enlightening it might be, to go into the detailed reasoning of each of these cases. Typical of the reasoning, however, seems to be the idea that the elimination of slums and the erection of safe and sanitary low-rent dwelling units for persons of the prescribed restrictive incomes can do much to advance the public welfare and protect the public safety and morals.

In passing upon the propriety of condemnation of private property in order to permit the Authority to effect its purpose, we must consider the case of Matter of New York City Housing Authority v. Muller, 270 N. Y. 333, 1 N. E. (2d) 153, 105 A. L. R. 905. That case appears to be one of the first, if not the first, dealing with the problem. There, a municipal corporation organized under the municipal housing law of New York sought to condemn premises for the purpose of clearing, replanning, and reconstructing a part of an area in New York City which apparently contained substandard and unsanitary housing. Condemnation was resisted on the ground

that the state act violated both federal and state constitutions (270 N. Y. 338, 1 N. E. [2d] 153) "because it grants to petitioner the power of eminent domain for a use which is not a public use." The court there said (270 N. Y. 340, 342, 1 N. E. [2d] 155):

"The fundamental purpose of government is to protect the health, safety and general welfare of the public. All its complicated activities have that simple end in view. Its power plant for the purpose consists of the power of taxation, the police power and the power of eminent domain. Whenever there arises, in the State, a condition of affairs holding a substantial menace to the public health, safety or general welfare, it becomes the duty of the government to apply whatever power is necessary and appropriate to check it. There are differences in the nature and characteristics of the powers, though distinction between them is often fine. (People ex rel. Durham R. Corp. v. La Fetra [230 N. Y. 429, 130 N. E. 601, 606, 16 A. L. R. 152], *supra,* p. 444.) But if the menace is serious enough to the public to warrant public action and the power applied is reasonably and fairly calculated to check it, and bears a reasonable relation to the evil, it seems to be constitutionally immaterial whether one or another of the sovereign powers is employed.

\*    \*    \*    \*    \*

"It is also said that since the taking is to provide apartments to be rented to a class designated as 'persons of low income,' or to be leased or sold to limited dividend corporations, the use is private and not public. This objection disregards the primary purpose of the legislation. Use of a proposed structure, facility or service by everybody and anybody is one of the abandoned universal tests of a public use. (Mt. Vernon-Woodberry Cotton Duck Co. v. Alabama Interstate Power Co., 240 U. S. 30, 32 [36 S. Ct. 234, 236, 60 L. ed. 507, 511]; Strickley v. Highland Boy Gold Mining Co., 200 U. S. 527 [26 S. Ct. 301, 50 L. ed. 581]; Rindge Co. v. County of Los Angeles, 262 U. S. 700 [43 S. Ct. 689, 67 L. ed. 1186]; Fallbrook Irrigation District v. Bradley, 164 U. S. 112, 161, 162 [17 S. Ct. 56, 64, 41 L. ed. 369, 389, 390].) The designated class to whom in-

cidental benefits will come are persons with an income under $2,500 a year, and it consists of two-thirds of the city's population. But the essential purpose of the legislation is not to benefit that class or any class; it is to protect and safeguard the entire public from the menace of the slums. * * *

"Nothing is better settled than that the property of one individual cannot, without his consent, be devoted to the private use of another, even when there is an incidental or colorable benefit to the public. The facts here present no such case. In a matter of far-reaching public concern, the public is seeking to take the defendant's property and to administer it as part of a project conceived and to be carried out in its own interest and for its own protection. That is a public benefit and, therefore, at least as far as this case is concerned, a public use."

The case of Housing Authority v. Dockweiler, 14 Cal. (2d) 437, 450, 94 P. (2d) 794, 801, supports the theory that the elimination of slums and the erection of safe and sanitary low-rent dwelling units for persons of the prescribed restrictive income will do much to advance the public welfare, protect public safety and morals, and "are in fact and law public purposes."

In Rindge Co. v. County of Los Angeles, 262 U. S. 700, 707, 43 S. Ct. 689, 693, 67 L. ed. 1186, 1193, the United States Supreme Court said:

"* * * Public uses are not limited, in the modern view, to matters of mere business necessity and ordinary convenience, but may extend to matters of public health, recreation and enjoyment."

In its apparent approach for the first time to a case similar to the one before us, in which eminent domain was attacked as not being a taking for public use and a violation of due process as taking from one person to give to another, the supreme court in Dornan v. Philadelphia Housing Authority, 331 Pa. 209, 213, 200 A. 834, 836, said:

"A legislative project of this nature goes beyond anything heretofore attempted in this State. It naturally invites, therefore, the

attack of those who are inclined to regard all experiments in our social and economic life as presumptively unconstitutional. Such challenges must fail, however, if, upon analysis, it appears that the only novelty in the legislation is that approved principles are applied to new conditions. Neither our State nor our federal constitution forbids changes, merely because they are such, in the nature or the manner of use of methods designed to enhance the public welfare; they require only that the new weapons employed to combat ancient evils shall be consistent with the fundamental scheme of government of the Commonwealth and the nation, and shall not violate specific constitutional mandates."

The elimination of slums could be found as a direct benefit and advantage to all of the people, according to similar reasoning advanced by the supreme court of Massachusetts in Allydonn Realty Corp. v. Holyoke Housing Authority, 304 Mass. 288, 23 N. E. (2d) 665, in sustaining the constitutionality of legislation comparable to that before us.

In an article appearing in 34 Minn. L. Rev. 610, 634, 636, *Public Aid to Housing and Land Redevelopment,* by Stefan A. Riesenfeld and Warren Eastlund, the following statement appears:

"* * * It is thoroughly settled that the combined slum-clearance and low-rent housing program constitutes a public purpose and a public use to warrant the exercise of the power of eminent domain and the use of the taxing power for its execution.

* * * * *

"* * * Of course, it appears generally recognized that the new housing need not be located on the slum area and that even owners of property outside of blighted areas are subject to the power of eminent domain."

It is our opinion that on the question of public use in eminent domain cases State ex rel. Twin City B. & I. Co. v. Houghton, 144 Minn. 1, 174 N. W. 885, 176 N. W. 159, 8 A. L. R. 585, would appear to have settled the matter in Minnesota as far as the issues involv-

ing eminent domain in litigation are concerned. In that decision it was held that the establishment of a restricted residential district by the exercise of the power of eminent domain and the prohibition of the erection of an apartment house therein constituted condemnation for a public use. The court there said (144 Minn. 16, 20, 176 N. W. 161, 162):

"The notion of what is public use changes from time to time. Public use expands with the new needs created by the advance of civilization and the modern tendency of the people to crowd into large cities. Such a taking as here proposed could not possibly have been thought a taking for public use at the time of the adoption of our Constitution when the state was practically a wilderness without a single city worthy of the name. 'The term "public use" is flexible, and cannot be limited to the public use known at the time of the forming of the Constitution.' Stewart v. Great Northern Ry. Co. 65 Minn. 515, 68 N. W. 208, 33 L. R. A. 427. *What constitutes a public use at the time it is sought to exercise the power of eminent domain is the test.* The Constitution is as it was when adopted, but, when it employs terms which change in definition as conditions change, it refers to them in the sense in which they are meant when the protection of the Constitution is sought. The Constitution of this state nowhere attempts to define what may be a public use, nor does it prohibit the legislature from determining what shall be deemed such a use.

"In comparatively recent times it was questioned whether a public use extended so far as to justify the condemnation of property and the expenditure of money for public parks, or for boulevards, or for pleasure drives, or for public baths, or for playgrounds, or for libraries and museums or for numerous other purposes which contribute to the general good. Now condemnation and expenditures for these and like or similar purposes is common, and recognized as lawful. Not so very long ago there would have been a revolt against restricting a property owner in the full use of his lot to the street line. But a condemnation for the purpose of widening a street by adding a

strip on each side which is not to be used for travel, but for ornament and beauty, and with the reservation of a limited use in the owner, is held valid. * * *

\* \* \* \* \*

"* * * It is time that courts recognized the aesthetic as a factor in life." (Italics supplied.)

The holding of that opinion was adhered to in State ex rel. Madsen v. Houghton, 182 Minn. 77, 233 N. W. 831. See, also, Spahn v. Stewart, 268 Ky. 97, 103 S. W. (2d) 651, holding that the proposed housing project considered in that case was for a public use and governmental purpose and that the land could be condemned for the project.

Plaintiffs contend that in Minnesota there is a distinction between public use and public benefit and that public use must be established in order to sustain the power of eminent domain. It is our opinion that the many cases cited above clearly establish that public housing and slum clearance constitute public use of property. They argue that the instant case falls directly within the rule of Minnesota Canal & Power Co. v. Koochiching Company, 97 Minn. 429, 107 N. W. 405, 5 L.R.A.(N.S.) 638. That was an appeal from an order and judgment dismissing a petition for the appointment of appraisers in condemnation proceedings. Appellant petitioner proposed to take defendants' lands for the following purposes: (1) To create a water power and to construct, create, and maintain a water-power plant at West Duluth by which to (a) supply water power from the wheels thereof and (b) generate and distribute electricity for light, heat, and power purposes; (2) to construct and maintain a canal, canals, or waterways on which to operate canal barges and to be otherwise used for purposes of navigation.

We do not consider that case as controlling under the facts and circumstances here. Defendants there contended that there was no statutory authority for petitioner's enterprise and that the uses to which petitioner proposed to put the property were at least in part private uses. The trial court refused to grant the petition because

the purpose for which the petitioning corporation was organized and for which it sought to condemn the lands and rights sought to be condemned were not all public uses, but that private uses were involved and were possible thereunder. This court held that petitioner could not exercise the power of eminent domain unless it was able to show legislative authority. This court agreed with the trial court that the purposes stated in the petition were part public and part private and that the right to proceed under condemnation must be denied. The court discussed the matter of public uses and public benefits in that case, pointing out that the existence of indirect and incidental benefits to the general public does not necessarily make use a public use. We believe that the reasoning used in State ex rel. Twin City B. & I. Co. v. Houghton, 144 Minn. 1, 174 N. W. 885, 176 N. W. 159, 8 A. L. R. 585, *supra,* in line with the many other authorities already cited, is sufficient under the facts and circumstances of the instant case to sustain the proposition that there will be no abuse of the power of eminent domain in the proposed action of defendants.

In considering the power of eminent domain insofar as it relates to the law now under consideration, we recognize that the public has a twofold interest in the contemplated work of the Authority. First, it is acknowledged that the existence of slums creates social problems which not only affect people living in the slum district, but, in a sense, the public as a whole. It is our opinion that the elimination of a slum district is a direct benefit to all property owners, even as the establishment of a parkway would be a benefit to them all. Second, the existence in any community of families who are unable to acquire suitable housing accommodations for themselves because their incomes are so low that the rentals they are able to pay are not attractive to the construction of dwellings by private capital for rental purposes creates a problem in modern society which affects the welfare not only of such persons but of the entire community. In this respect, the supreme court of Michigan said in In re Jeffries Homes Housing Project, 306 Mich. 638, 647, 11 N. W. (2d) 272, 275:

"* * * Years of experience heretofore have proven that the construction of such homes has rarely been regarded as an attractive financial investment by private capital."

Providing housing accommodations for persons of low income under conditions contemplated in the act affords additional reasons why the legislature properly could direct the authority to condemn real estate in order to acquire a site for such housing accommodations, even though the site may be separate and some distance from the slum dwellings for which such new accommodations are established as a substitute. We therefore hold that the act in question is not in violation of Minn. Const. art. 1, § 13.

■ While not necessarily in the order outlined in plaintiffs' brief, we shall next consider other objections raised by them wherein they claim that the proceedings sought to be enjoined violate various articles and sections of the Minnesota constitution. They contend that the property of the housing authority is not "public property used exclusively for any public purpose," and, as such, cannot be tax-exempt. Minn. Const. art. 9, § 1, provides in part:

"* * * public property used exclusively for any public purpose, shall be exempt from taxation, * * *."

Plaintiffs claim also that the removal of property from the tax rolls, to be used for a nonpublic purpose, is taking their property without due process of law by causing an increase in real property taxes, in violation of Minn. Const. art. 1, § 7, and U. S. Const. Amend. XIV. Art. 1, § 7, provides in part:

"No person shall be * * * deprived of * * * property without due process of law."

U. S. Const. Amend. XIV, contains similar limitations upon the powers of the states.

We cannot agree with plaintiffs' contentions on these points, since they are based upon their assumption that the building of low-rent housing does not constitute a public purpose. We have already said that such low-rent housing projects as are contemplated under the

facts and circumstances before us *do* constitute public uses or purposes, and this disposes of plaintiffs' claim in that connection. We see no purpose in considering further plaintiffs' argument that the provisions of paragraph 3 of the cooperation agreement, under which the city of Duluth "agrees that it will not levy or impose any real or personal property taxes or special assessments under such Project," constitute a surrender of the power of taxation, inasmuch as the contemplated property will be tax-exempt as public property. See, also, M. S. A. 462.575.

We disagree with plaintiffs' claim that the act providing for public housing for low-income families is class legislation, in violation of Minn. Const. art. 1, § 2, which reads in part:

"No member of this State shall be * * * deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land, or the judgment of his peers."

This section prohibits class legislation. State ex rel. Luria v. Wagener, 69 Minn. 206, 72 N. W. 67, 38 L. R. A. 677. Class legislation is also forbidden by Minn. Const. art. 4, § 33, which forbids special legislation. These constitutional provisions do not forbid classification. The exercise of the legislative process necessarily involves classification. Lyons v. Spaeth, 220 Minn. 563, 20 N. W. (2d) 481, 162 A. L. R. 1041. To be constitutionally objectionable, the classification must be unreasonable and arbitrary. George Benz Sons, Inc. v. Ericson, 227 Minn. 1, 34 N. W. (2d) 725.

The argument of plaintiffs is that the contemplated action of defendants will produce an unconstitutional result, because such action must conform with M. S. A. 462.475, subd. 1, which provides:

"In the operation or management of housing projects an authority shall at all times observe the following duties with respect to rentals and tenant admissions:

"(1) It may rent or lease the dwelling accommodations therein only to persons of low income and at rentals within the financial reach of such persons of low income;

"(3)   An authority in its operations within a municipality shall not accept any person or persons as tenants in any housing project if the person or persons who occupy the dwelling accommodations. have an aggregate annual net income in excess of five times the annual rental of the quarters to be furnished such person or persons, * * * *."

Plaintiffs further argue that these provisions of the statute constitute an arbitrary classification by furnishing privileges to certain groups and not to others.

The following Minnesota cases are authority for the proposition that the propriety of any classification is for the legislature so long as the classification is reasonable and not arbitrary: Seamer v. G. N. Ry. Co. 142 Minn. 376, 172 N. W. 765; Minnesota W. G. Co-op. Marketing Assn. v. Huggins, 162 Minn. 471, 203 N. W. 420; Dimke v. Finke, 209 Minn. 29, 295 N. W. 75; Apartment Operators Assn. v. City of Minneapolis, 191 Minn. 365, 254 N. W. 443. Any classification is permissible which has a reasonable relation to some permitted end of governmental action. State ex rel. Equity Farms, Inc. v. Hubbard, 203 Minn. 111, 280 N. W. 9.

Courts of other jurisdictions have uniformly rejected arguments of the same nature based upon similar provisions of state constitutions. Housing Authority v. Dockweiler, 14 Cal. (2d) 437, 94 P. (2d) 794; Humphrey v. City of Phoenix, 55 Ariz. 374, 102 P. (2d) 82; Spahn v. Stewart, 268 Ky. 97, 103 S. W. (2d) 651; Housing Authority of City of Dallas v. Higginbotham, 135 Tex. 158, 143 S. W. (2d) 79, 130 A. L. R. 1053; Denard v. Housing Authority of Fort Smith, 203 Ark. 1050, 159 S. W. (2d) 764; Franco v. City of New Haven, 133 Conn. 544, 52 A. (2d) 866; Williamson v. Housing Authority of Augusta, 186 Ga. 673, 199 S. E. 43; Matter of New York City Housing Authority v. Muller, 270 N. Y. 333, 1 N. E. (2d) 153, 105 A. L. R. 905. See, also, Benjamin v. Housing Authority of Darlington County, 198 S. C. 79, 15 S. E. (2d) 737; Krause v. Peoria Housing Authority, 370 Ill. 356, 19 N. E. (2d) 193; In re Brewster Street Housing Site, 291 Mich. 313, 289 N. W. 493.

Minnesota statutes providing poor relief and old-age assistance, where classification is based upon property ownership and income, bear some analogy to the legislation being considered here. In Reed v. Bjornson, 191 Minn. 254, 266, 253 N. W. 102, 108, where the Minnesota income tax law was challenged, we said:

"Ability to pay and extent of protection or benefit appear to the courts to be proper considerations to justify classification."

■ Minn. Const. art. 4, § 27, provides:

"No law shall embrace more than one subject, which shall be expressed in its title."

Plaintiffs contend that the act embraces more than one subject: (1) Public bodies called housing and redevelopment authorities are created to construct low-cost public housing; and (2) private companies and insurance companies are authorized to redevelop areas to be used for "private housing for upper or middle-income groups, * * * commercial and other purposes," citing M. S. A. 462.545. They argue that the only connection between the two subjects is that they both contain the word "housing." They also argue that § 462.545, subd. 6, establishes new tax districts with authority to levy taxes. They maintain that nowhere in the title is reference made to taxing or tax districts; that the only reference to taxing in the title is the phrase which reads, "providing certain limited tax exemptions"; therefore, that the title allows only tax exemptions, not tax levies.

The title of the act (L. 1947, c. 487) is as follows:

"An act relating to the replanning, rehabilitation, and rebuilding of substandard, slum, blighted, and other areas in this state and to the furnishing of decent, safe, and sanitary housing for veterans, servicemen, and persons of low income, and their families; creating local housing and redevelopment authorities and defining their powers and duties; providing for cooperation with private enterprise in accomplishing the purposes of the act; providing methods of financing and authorizing the acceptance of federal and other

aid; authorizing the creation of limited dividend corporations to engage in redevelopment and defining their powers and duties; providing certain limited tax exemptions; authorizing financial institutions, insurance companies, fiduciaries, and others to invest in securities of authorities and redevelopment companies and to otherwise cooperate with them; granting powers to insurance companies in connection with redevelopment companies; defining powers of the state housing commission and other state agencies and officers in the administration of the act; granting to municipalities, authorities, and other public bodies the powers necessary for accomplishing the purposes of the act; and repealing Minnesota Statutes 1945, Sections 462.41 to 462.81, inclusive."

It is not intended that the title should be an index of the law; a fair suggestion of the subject matter is all that is necessary. City of Duluth v. Cerveny, 218 Minn. 511, 16 N. W. (2d) 779; State ex rel. Pearson v. Probate Court, 205 Minn. 545, 287 N. W. 297; Vorbeck v. City of Glencoe, 206 Minn. 180, 288 N. W. 4. With respect to this phase of the matter, the trial court stated in its memorandum:

"* * * The title seems to be compact and unified, and, without attempting to be indices of the contents of the act, which it need not be, it gives a clear and comprehensive indication of the comprehensive enactment to which they severally relate and complies with all the requirements referred to in Johnson v. Harrison, (1891) 47 Minn. 575, 50 N. W. 923, * * * It is significant that the subject of housing and urban redevelopment is now considered as one comprehensive problem not subject to piece-meal treatment and that the relevant federal housing legislation dealing with the subject has uniformly considered the problem of low rent housing and urban redevelopment as the subject of single legislative treatment."

We have carefully examined the title in its entirety in connection with the subject matter of the act and in connection with plaintiffs' objections. It is our opinion that the title of the act does not offend Minn. Const. art. 4, § 27. The primary purpose of the con-

stitutional provision that "No law shall embrace more than one subject, which shall be expressed in its title," was to prevent so-called "log-rolling legislation or omnibus bills," by which a number of different and disconnected subjects might be united in one bill and then carried through by a combination of interests, and to prevent surprise and fraud upon the people and the legislature by including provisions in a bill whose title gave no intimation of the nature of the proposed legislation or of the interests which might be affected if the bill became a law. Johnson v. Harrison, 47 Minn. 575, 50 N. W. 923, *supra,* where Mr. Justice Mitchell so ably stated (47 Minn. 577, 50 N. W. 924):

"* * * in deciding whether an act is obnoxious to this provision of the constitution, a very good test to apply is whether it is within the mischiefs intended to be remedied.

"* * * while this provision is mandatory, yet it is to be given a liberal, and not a strict, construction. It is not intended nor should it be so construed as to embarrass legislation by making laws unnecessarily restrictive in their scope and operation, or by multiplying their number, or by preventing the legislature from embracing in one act all matters properly connected with one general subject. The term 'subject,' as used in the constitution, is to be given a broad and extended meaning, so as to allow the legislature full scope to include in one act all matters having a logical or natural connection. * * * All that is necessary is that the act should embrace some one general subject; and by this is meant, merely, that all matters treated of should fall under some one general idea, be so connected with or related to each other, either logically or in popular understanding, as to be parts of, or germane to, one general subject. * * * All that is required is that the act should not include legislation so incongruous that it could not, by any fair intendment, be considered germane to one general subject. * * * The connection or relationship of several matters, such as will render them germane to one subject and to each other, can be of various kinds, as, for example, of means to ends, of different subdivisions of the same subject, or that all are designed for the same

purpose, or that both are designated by the same term. Neither is it necessary that the connection or relationship should be logical; it is enough that the matters are connected with and related to a single subject in popular signification. * * * The title was never intended to be an index of the law."

■ Plaintiffs claim that the legislature has unlawfully delegated legislative power to the commissioner of administration to determine what are low-income families, contrary to Minn. Const. art. 3, § 1, which provides for a separation of powers and reads:

"The powers of government shall be divided into three distinct departments—legislative, executive, and judicial; and no person or persons belonging to or constituting one of these departments shall exercise any of the powers properly belonging to either of the others, except in the instances expressly provided in this constitution."

M. S. A. 462.711 provides that, until the state housing commission is created by law and organized, the powers granted to and the duties imposed upon the commission shall be exercised and performed by the division of housing of the department of business research and development, if such a division in such a department is created by law; "otherwise, by the commissioner of administration of this state." Since the bills providing for these offices never passed the legislature, "the implementation of the provisions of this chapter devolve upon the commissioner of administration." Revisor's note to § 462.711.

Section 462.491 provides:

"The dwellings in public low-rent housing shall be available solely for families of low income whose net family income does not exceed the maximum net family income falling within the lowest 20 per cent by number of all family incomes in the area of operation as such maximum net family income shall have been determined, or from time to time redetermined, by the authority; provided that at the end of one year after the effective date of Laws 1947, Chapter 487, and each year thereafter, this restriction shall

be re-examined by the state housing commission, and a public hearing shall be held by the commission to determine whether administrative or interpretive difficulties or unsatisfactory progress in the provision of low-rent housing require a modification thereof. Upon the conclusion of that hearing the commission is authorized to and shall forthwith modify the restriction first set out in this section to the extent, if any, that may be required to make satisfactory progress in the provision of low-rent housing."

Plaintiffs further argue that the commissioner is empowered to reset the category of families which shall be considered low-income families; that no standards are prescribed for the exercise of this power; and that the commissioner is free to set it where he pleases if "administrative or interpretive difficulties or unsatisfactory progress in the provision of low-rent housing require a modification thereof."

The determination of "net family income falling within the lowest 20 per cent by number of all family incomes in the area of operation" is not the exercise of a legislative power. The process would be purely ministerial in character. The legislature may confer upon a board or commission a discretionary power to ascertain, under and pursuant to the law, some fact or circumstance upon which the law by its own terms makes or intends to make its own action depend. Lee v. Delmont, 228 Minn. 101, 36 N. W. (2d) 530. Insofar as the commissioner in the case at bar is authorized to modify the restricted group to whom the dwellings may be made available, we have a different problem. The standard there is made more general, *i. e.,* modification to the extent required "to make satisfactory progress in the provision of low-rent housing." It is not necessary that we here decide whether the law furnishes a reasonably clear policy or standard of action to control and guide the administrative officers in ascertaining the operative facts justifying a change in the restriction. We cannot anticipate that the commissioner will take unconstitutional action under a section of the statutes, and, insofar as the prayer for relief is based upon the ground of anticipated unconstitutional delegation of power,

plaintiffs' cause of action is premature. 11 Am. Jur., Constitutional Law, § 93; State ex rel. Clinton Falls Nursery Co. v. County of Steele, 181 Minn. 427, 232 N. W. 737.

Plaintiffs next contend that the legislature unlawfully delegated power to the Authority to determine who may live in the housing projects and the rentals to be charged, without prescribing in sufficient detail the standards for exercising such power. We feel that the standards established are sufficiently detailed. Section 462.491 provides that the housing shall be available only to those families whose net income is within the lower 20 percent by number of family incomes. As pointed out above, the fact that the act provides that the commissioner can change the 20 percent figure under certain conditions does not raise an issue at this time. The legislature also provided a sufficient standard to guide the Authority in fixing rentals. Under § 462.471, the Authority shall fix the rentals at rates no higher than necessary to produce revenues sufficient to accomplish the purposes there given in detail.

Plaintiffs contend that paragraphs 5(b, d) and 6(a) of the cooperation agreement constitute an unlawful delegation of the legislative power of the municipality over the location of streets, sewers, and water lines. It is true that a municipality may not delegate its governmental power without authority from the state legislature. State ex rel. City of St. Paul v. St. Paul City Ry. Co. 78 Minn. 331, 339, 81 N. W. 200, 201. However, a municipality is only a department of the state. It is a political subdivision created as a convenient agency for the exercise of such governmental power as may be entrusted to it. City of Trenton v. New Jersey, 262 U. S. 182, 43 S. Ct. 534, 67 L. ed. 937, 29 A. L. R. 1471.

In Monaghan v. Armatage, 218 Minn. 108, 112, 15 N. W. (2d) 241, 243, this court said:

"* * * Absent constitutional restriction, the legislature may at its pleasure modify or withdraw any powers so entrusted to a city, hold such powers itself, or vest them in other agencies. Hunter v. City of Pittsburgh, 207 U. S. 161, 178, 179, 28 S. Ct. 40, 46, 52 L. ed. 151, 159, cited with approval in City of Trenton v.

New Jersey [262 U. S. 182, 43 S. Ct. 534, 67 L. ed. 937, 29 A. L. R. 1471], *supra.*"

The legislature, through the housing act, has given broad powers to a functioning authority, itself a (§ 462.445) "public body corporate and politic," to undertake and carry out projects, including the construction of streets, sewers, water services, and other appurtenances. Since the legislature has given these powers to the Authority, it cannot be said that the city unlawfully has delegated its legislative powers by agreeing to accept dedication of streets, sewers, etc. The city of Duluth has not abandoned its power to determine where streets are to be located. Rather, the legislature, within the limitations prescribed in the act, has delegated this power to the Authority. A similar contention was met in Edwards v. Housing Authority of City of Muncie, 215 Ind. 330, 340, 19 N. E. (2d) 741, 746, where the court said:

"It is argued that the act is invalid in that it is an attempt on the part of both the General Assembly and the city of Muncie to surrender and alienate police and governmental power. It is conceded that many of the things which the city may contract to do under the act have to do with the exercise of police and governmental powers, but both the city and the housing authority are public corporations, to which the legislature may delegate governmental and police power, and therefore, in making agreements, they simply exercise a power expressly delegated to them as bodies politic. * * * The city of Muncie merely agrees with the other body corporate that it will exercise certain powers, which it now holds with respect to certain matters, in co-operation with, and in aid of, the housing authority in the accomplishment of the public purpose contemplated by the legislation in question. * * * No reason is seen why it may not be done if the legislature authorizes it as it has done here; and no authority to the contrary is called to our attention."

■ In connection with plaintiffs' other objections apart from the constitutional objections referred to above, M. S. A. 462.465, subd. 1, provides:

"An authority shall not initiate any low rent housing project, and shall not enter into any contract with respect thereto, until it has made findings, after an analysis of the local housing market, (1) that there is need for such low rent housing which cannot be met by private enterprise and (2) that a gap of at least 20% has been left between the upper shelter rental limits for admission to the proposed low rent housing and the lowest shelter rents at which private enterprise is providing (through new construction and existing structures) a substantial supply of decent safe and sanitary housing; and unless the governing body of the municipality has by resolution affirmed those findings of the authority and approved the provision of that low rent housing project, and unless the provision of public low rent housing projects has been approved by the voters of the municipality as provided in subdivision 2; provided however that this subdivision shall not be applicable to any public low rent housing projects for which financial assistance is provided by the federal government or any agency or instrumentality thereof, and which does not require any direct loan or grant of money from the municipality as a condition of a federal financial assistance. An authority shall not make any contract with the federal government or any agency thereof for a low rent housing project unless the governing body of the municipality has by resolution approved the provision of that low rent housing project."

The contention is that the city of Duluth, by passing ordinance No. 6831, has tried to approve in advance all housing projects which the Authority may undertake under its 500-unit program reservation from the PHA.

It is our opinion that the language of the statute, considered in the light of the over-all purpose of the federal and state legislation contemplating public housing, means the entire project contemplated at the time the approval is sought, rather than a separate approval for each building constructed.

■ Finally, plaintiffs argue that the priority to be given by the Authority to displaced families will violate the veterans' priority

of the act and that the priority to be given by the Authority to veterans of World War I will violate the act's priority to be given to World War II veterans only.

We do not feel that there is anything contained in the agreement which will prevent the Authority from giving priorities as contemplated by the federal and state acts. We assume that the Authority and the persons charged with the responsibility of giving priorities will be able to reconcile any apparent conflicts which may arise. No purpose would be served by passing judgment on this matter until an improper grant of priority has first been given.

Affirmed.

---

[1]Reported in 48 N. W. (2d) 169.